ARNOLD WITTMER, Appellee, v. DEXTER MANUFACTURING COMPANY et al., Appellants.

MASTER AND SERVANT: Workmen's Compensation Act—Findings by Commissioner—Conclusiveness. A finding by the industrial commissioner, on conflicting, competent testimony, that an injury to an employee arose out of a sportive contest voluntarily participated in by the injured employee and a co-employee, is conclusive on the court. (See Book of Anno., Vol. 1, Sec. 1452.)

Headnote 1: Workmen's Compensation Acts—C. J. pp. 122, 123.

Headnote 1: L. R. A. 1917D, 188; 28 R. C. L. 828.

*Appeal from Jefferson District Court.*—E. S. WELLS, Judge.

JULY 1, 1927.

The district court reversed an order by the industrial commissioner denying compensation to plaintiff under the Workmen's Compensation Act, and the defendants appeal.—*Reversed.*

*Miller, Kelly, Shuttleworth & McManus*, for appellants.

*Ralph H. Munro*, for appellee.

VERMILION, J.—The appellee, Wittmer, was in the employ of the Dexter Manufacturing Company. He received an

injury while proceeding, with other employees at the close of the day's work, to register his departure at one of two time clocks located in the factory building, and provided by the employer for that purpose. Another employee, one Steel, was endeavoring to prevent appellee from reaching the clock, and caught hold of him. They fell, and appellee's leg was fractured. There was no obstruction on the floor, and no other cause for the fall than the conduct of one or both of the men. Whatever was done by either Steel or the appellee was in a friendly spirit of fun, and with no ill will.

The industrial commissioner affirmed a finding by an arbitration committee to the effect that the claimant had failed to carry the burden of proving that his injury arose out of his employment, and denied compensation. This result was based upon a finding of fact by the commissioner that the claimant participated in a contest, suggested by Steel, as to which should first reach the time clock. The district court found that there was "no competent evidence that the claimant voluntarily participated in any so-called horseplay," and allowed compensation.

Appellants contend that the finding of fact by the industrial commissioner that appellee participated in a contest with Steel as to which should first reach the clock was upon conflicting testimony, and was, therefore, conclusive upon the court.

The statute requires that an injury to an employee, to be compensable, must have been one arising out of and in the course of the employment. Section 1363, Code of 1924. The terms are not synonymous, and the burden is upon a claimant to establish, not only that his injury was received in the course of his employment, but also that it arose out of his employment. *Sparks v. Consolidated Ind. Coal Co.*, 195 Iowa 334. It is conceded that appellee received his injury in the course of his employment. The sole ultimate question in the case is whether it arose out of the employment.

It was recognized by the industrial commissioner that, in a number of states, compensation under workmen's compensation acts is denied where the injury resulted from sportive acts or horseplay of employees, it being held that an injury so received did not arise out of the employment. He put his

conclusion, however, upon a less broad and general ground than that, saying:

"The department, however, has been disposed to hold with decisions elsewhere to the effect that the victim of a sportive act who has not himself actively or passively participated in disastrous horseplay is entitled to recover for disability sustained."

Cases illustrating these different views will be found in exhaustive notes in 13 A. L. R. 540, 20 A. L.. R. 882, 36 A. L. R. 1469, and 43 A. L. R. 492. The situation in the present case does not require us to determine this precise question; for it appears to be conceded by appellee that, if he participated with Steel in the horseplay or skylarking which resulted in his injury, he was not entitled to compensation. Our consideration of the case will be confined to this narrower aspect of it.

At the outset, appellee is confronted with the finding of the commissioner that he did participate in the play which resulted in his injury. The findings of fact made by the commissioner, in the absence of fraud, are conclusive. Section 1452, Code of 1924. His order or decree, if within his powers, and not procured by fraud, can only be reversed on appeal to the courts if the facts found by him do not support the order, or there is not sufficient competent evidence to warrant the making of the order. Section 1453. We have many times construed these provisions, and have held that the commissioner is the final and exclusive judge of questions of fact under conflicting evidence. *Pace v. Appanoose County*, 184 Iowa 498; *Flint v. City of Eldon*, 191 Iowa 845; *Sparks v. Consolidated Ind. Coal Co.*, supra; *Murphy v. Shipley*, 200 Iowa 857.

If, therefore, the evidence is in conflict upon the question, and there is sufficient evidence to support the finding of the commissioner that appellee participated in the playful acts which brought about his injury, it is apparent that the judgment of the district court cannot be sustained. The determination of this question requires an examination of the evidence.

The appellee testified:

"On the evening of September 24, 1925, just as we were going to the clock, to punch out, Charlie Steel took hold of my arm, and kept pulling back. He said I wasn't to go any

faster than he was. Just before I got to the clock, I gave a jerk, to get loose, and that overbalanced us some way, and we both fell down, and he fell on top of my leg, and that broke my leg. * * * Charlie Steel was another employee of the Dexter Company at that time. He was aiming to punch the clock. I did not take hold of him, or do anything to him. He just took hold of me by my arm, and kept me from going as fast as he did. He had hold of my arm until I jerked loose, and at that time we were about 25 or 30 feet from the clock. There was no bad feeling between us, and our relationship was friendly, and there wasn't any reason for him hurting me * * *."

On cross-examination, his attention was called to a written statement of facts, signed by him some days after the accident, in which he said:

"Chas. Steel tried to get ahead of me and kept pulling me back, but I kept pretty well even with him until he stuck out his leg and tripped me. As I fell he fell on top of me and broke my leg. We were not fighting, and he did not mean to injure me, but we were only jostling each other to get to the time clock first. He was trying to hold me from the time we started up the steps from the machine shop until we got on the next floor part way to the clock. We were not fighting, but were only on our way to punch out, and he was holding me back. I do not think I held him from going by, and if he had wanted to pass me he would of. I do not remember whether I had my hands on him or not, but I might have had my hand on his shoulder. We were talking together, and he was holding, and saying 'What's your hurry?' I told him I wasn't in any hurry. He kept kidding, and said that my check would be there, and I didn't have to hurry."

Concerning this statement he said:

"This statement was signed by me, and was all true except that one fact, and I wish now to suggest that I meant I tripped over him, rather than he tripped me. I was tending to my business. I was jostling, like it says there."

Steel testified:

"As near as I can tell, it was on pay night. The horn blowed, and me and him went upstairs together. We was acting the fool. There is two rooms, * * * a partition that you

have to go through, and by the time we got to the door, we really wasn't acting the fool. He was just trotting along, and I was, too. What his intention was, I don't know; but my intention was to beat him to the clock. I punched the same clock. He fell in front of me, and I fell on him. I do not know how he happened to fall. I had no thought of injuring him or the company or anybody. We were going to punch out for the day's work, a minute or two after 6 o'clock in the evening. In the fall, his leg was broken. * * * If I did trip him, I didn't do it intentionally, but I didn't trip him. It isn't possible, that I know of, that he may have fallen over my feet or limbs some way. When we were going up the steps to the last room before the place of accident, Mr. Wittmer and I were not particularly scuffling,—just kidding one another. We wasn't pushing one another,—not in particular,—not holding one another; wasn't scuffling or anything; just like a couple of fellows would. It was my intention to get to the clock ahead of Wittmer, but I didn't get by him. He didn't get hold of me. He was ahead of me,—kind of to the side, is my recollection,—and we was both trotting along. I do not know that Wittmer had any reason to be in a hurry.''

Snider testified:

''I think Steel had hold of him in the first room that we went through as we went upstairs,—had a hold of his arm. Wittmer was doing nothing, only trying to get loose. I apprehend Wittmer was wanting to rush ahead to the clock, and Steel was kidding him about that he wasn't to do that that night, or some such language. * * * What broke the leg was Steel grabbing him; and Wittmer jerking at the same time was sufficient to throw him, in my opinion, regardless of being tripped; but their feet could have been tangled.''

Gossick testified:

''Steel had hold of Wittmer's arm, and they were walking along, and they passed on by me, * * * and at that time, Wittmer jerked loose from him. Steel made a grab at him, and Wittmer fell. They had broken loose where I was, and were dodging around farther ahead. * * * As near as I could see, Wittmer was not doing anything to hinder or delay Steel. * * * I couldn't tell what caused the fall, only when Steel made the second grab,—of course, they were pulling so,—I looked

around to another fellow by the side of me where we had formed into line. When I looked back, they were on the floor, and Steel was on top.''

On cross-examination, he said:

''I could not say as to Steel trying to get around Wittmer, but they were just jostling together until they fell there. * * * All I seen was that they were jostling together * * * When I first observed Wittmer and Steele, they were by the side of me, walking a little faster than I. They probably got 6 or 8 feet ahead of me when Wittmer pulled loose from Steel, so then they started and dodged around a couple of parties, and then Steel got Wittmer by the arm again, and then is when they went down. They came up behind me when they got by my side. They were going faster than we folks. I couldn't say how many they passed, but it must have been 2 or 3.''

J. C. Miller testified:

''They were trying to see which one could get to the clock the quickest. Wittmer was trying to get loose from Steel, and he jerked loose.''

On cross-examination, he said:

''My impression was that Steel was holding Wittmer, who was ahead. I observed that they moved considerably faster than the rest of the line. They were not running or trotting,—simply walking fast. They had no line. They were going to the east clock. We went to the west.''

At this point, it is not the fact that Steel was the aggressor, and was trying to hinder appellee's progress to the clock, or that appellee was trying to escape from him, that is material, but that they were both engaged in a friendly contest,—that they were jostling together, as some of the witnesses expressed it, and as appellee admitted.

We conclude that there was evidence supporting the finding of the commissioner that the appellee voluntarily participated in the play—the jostling—that caused his fall and injury, and that the injury did not arise out of his employment. It follows that this finding was conclusive upon the district court, and that court was not at liberty to find the fact to the contrary.

The judgment must be, and is,—*Reversed.*

All the justices concur.