RUDOLPH LINDAHL, Appellee, v. L. O. BOGGS COMPANY et al., Appellants.

No. 46670.

MAY 8, 1945.

Miller, Huebner & Miller, of Des Moines, for appellants.

Kenneth H. Davenport, of Creston, for appellee.

MANTZ, J.—This is a proceeding under the Workmen's Compensation Act by Rudolph Lindahl, claimant, against the L. O. Boggs Company and its insurance carrier, the Employers Mutual Casualty Company, wherein claimant seeks disability benefits. The deputy industrial commissioner denied his claim and upon review the industrial commissioner confirmed the finding of the deputy. Upon appeal to the district court the action and finding of the industrial commissioner were reversed and claimant was awarded compensation. The employer and its insurance carrier have appealed. The issue was whether the claimant had established his claim so as to be entitled to an award of compensation.

I. After a careful examination of the evidence appearing in the record we find ourselves unable to agree with the finding of the trial court and hold that the finding and decision of the industrial commissioner should have been sustained.

As the outcome of this case turns upon matters of evidence we will set out somewhat in detail the evidence given by the medical witnesses, in order to show conflicts therein upon which the industrial commissioner could properly base his opinion. There was no serious conflict in the evidence aside from that given by the medical witnesses. The appellee had worked off and on for the Boggs Company, wholesale grocers at Creston, Iowa, for about two years. He was forty-two years old and single. On March 13, 1943, he arose, walked a few blocks from his home to a restaurant where he had breakfast, and then went by auto about seven or eight blocks to the warehouse, arriving there about 6:40 a. m., and about 7 a. m. went with three truckers, Cornelison, Cheney, and Benson to the basement, using the elevator. The truckers took with them an empty four-wheel truck three feet wide, five feet long, and nineteen inches high, and pushed it to the end of the basement about seventy-five feet from the elevator and stopped it close to a pile of cartons containing syrup. These were of pasteboard, ten and one-half inches wide, fifteen and one-half inches long, and

nine inches high, and weighed forty-two and one-half pounds. Thirty of these cartons were placed on the truck. No walking was required. They were picked up one at a time. Seven of these cartons were put on the truck by appellee. The loading was done in the usual and customary manner. Lindahl had loaded similar cartons before and did so in the manner followed on this particular morning. At other times he had loaded heavier packages weighing as much as sixty pounds and bags of sugar weighing one hundred pounds. On this particular occasion he made no complaints; he did not slip or fall or lose his footing. He acted the same as he usually did and did the work as he ordinarily did and at no time did he put forth any extra or unusual effort. Following the loading of the truck the three truckers pushed it to the elevator, with Lindahl walking along carrying the lists of the things loaded. He did not go up in the elevator but told the others that he would get ready for the next load by getting some spices in the extract department. This was close to the elevator, was a caged-off room about twenty by twenty feet, and on the same floor as the cartons. As the truckers went up in the elevator they last saw Lindahl in the extract room starting back into the corner. They did not at any time observe anything unusual in his conduct or appearance. Following the unloading of the truck the truckers returned to the basement by the elevator, having been gone from five to eight minutes. They pushed the truck back to where the cartons were to get another load. One of the truckers, Cornelison, stopped at the spice cage to see Lindahl, who was standing about six feet from the door trying to roll a cigarette and having trouble doing so. During the time the truckers were gone Lindahl had gotten two cartons of spice ready for loading and had carried them about twelve feet, where he had piled them on some cases near the center of the spice department. These cartons weighed about two pounds each. It was about 7:25 a. m. when Cornelison noticed Lindahl trying to roll a cigarette. Cornelison asked Lindahl what was the matter and he replied, ''Everything is the matter.'' Upon suggestion that he call a doctor Lindahl said he would be all right in a little bit. Cornelison then went out, returned with

the other truckers and found Lindahl sitting on some cases. Mr. Boggs was called and Lindahl was taken to the hospital. He was conscious at all times before he reached the hospital. Until he was taken to the hospital he was able to and did talk freely. At no time did he claim that he hurt or injured himself or state what was causing him to feel as he did. He did not claim that he had strained or overexerted himself, or had done any heavy lifting, or that he had slipped, fallen, or that anything out of the ordinary had occurred. At the hospital he was given a physical examination and no evidence of trauma, cuts, or bruises was found on his body. At the spice department Mr. Boggs asked appellee what was the matter and he said he did not know and made no claim of having hurt or injured himself.

II. Four medical witnesses, all from Creston, were called, two by each party. Appellee called Dr. W. E. Crouse, a chiropractor, who had practiced for ten years; he also called Dr. J. A. Liken, physician and surgeon, of six years' experience. Appellants called Dr. Howard Beatty, physician and surgeon of eleven years' experience; also Dr. James B. Macrae, of thirty-four years' experience in practice and surgery. At the time Dr. Macrae testified he was practicing surgery exclusively.

Following the time appellee left the hospital in April 1943, Dr. Crouse gave him many treatments. At the time of the trial he had treated appellee fifty-two times. He said that the disease was apoplexy—paralysis of the left side; his disability was permanent:

"Q. His disease was as you have mentioned apoplexy. Is that the same thing as cerebral hemorrhage? A. Apoplexy, cerebral hemorrhage and stroke."

He testified to the condition and working of the heart in a case where high blood pressure was present and stated that if one had high blood pressure and put on the least exertion he would have a stroke. In answer to a hypothetical question inquiring the cause of appellee's condition, in which was recited the activities of Lindahl that morning at the warehouse, prior to his being taken to the hospital, he said:

"Well, in lifting this large box, Exhibit '1' [syrup carton], whatever it was, would be enough to cause a stroke and it was probably that process that brought the stroke about and in ten or fifteen minutes it would take that long before you would get the result from the stroke."

On cross-examination Dr. Crouse said that high blood pressure is what is called hypertension; that the fact of the matter is, the symptom of paralysis often does not show up for a couple of hours after the exertion that causes or superinduces the paralysis; that it could be longer or shorter; that medical science has not been able to tell yet.

Dr. Liken attended Lindahl at the hospital and found him unconscious and paralyzed on the left side. Lindahl left the hospital April 14th. Dr. Liken diagnosed his condition as cerebral hemorrhage, which meant the rupture of a blood vessel, and there was bleeding into and about the brain tissue. He gave his opinion that the cerebral hemorrhage was caused by hardening of the arteries. He further stated that ordinarily the immediate occasion or cause of cerebral hemorrhage is exertion and ordinarily the hemorrhage may occur during or right after the exertion. He further stated that if Lindahl was engaged in moving merchandise immediately preceding the hemorrhage it would be a probable cause; that exertion raises the blood pressure and increases the heart beat.

On cross-examination Dr. Liken said that he found no evidence of trauma; that Lindahl had arteriosclerosis or high blood pressure; he said it was his opinion that hardening of the arteries or hypertension had pre-existed March 13, 1943; that the probabilities were that this condition had progressed over a period of years; that it is a progressive disease; cerebral hemorrhage is a result of hypertension and progressive arteriosclerosis; that when Lindahl was in the hospital a test indicated a rather exaggerated hypertension and that in all probability there had been a rather aggravated case of hypertension pre-existing March 13, 1943. He was asked the following question:

"Q. Now, Doctor, with these arteries in that condition that you found them to be in and with the hypertension you have testified to that you have found here as to whether what

the man was doing in his employment during the half hour that he was at work on March 13, 1943, was a contributing factor would depend upon the extent or the amount of exertion he put forth, wouldn't it? A. The answer is yes. Ordinarily speaking a stroke is produced by exertion, but there are instances in which strokes are encountered even in their sleep. Q. What I was trying to get at is whether this isn't true. That as far as you could go as a physician would be to say that what he was doing that morning in his employment might have been a material contributing factor in bringing on the hemorrhage and on the other hand it might not have been. Isn't that a fact? A. That is right. Q. Now another thing I notice you said in your direct examination that if the exertion whatever it was, little or much, was a material contributing factor to producing the hemorrhage, would signs or symptoms of it appear immediately following the exertion likely? A. Yes.''

He further stated where hypertension was present exertion might bring on and be a contributing factor to a stroke, no matter whether heavy or light; that he would expect the symptoms to manifest themselves immediately following whatever effort was a contributing factor; that people do have strokes of this kind with their arteries in this condition even when they are in bed or sitting around the house, or even with slight exertion; that the symptoms immediately after the effort are that the individual would ordinarily fall, if standing, and pass into unconsciousness; the pulse rate ordinarily would be lower and the blood pressure would drop and the face would be flushed; that there are other findings but the ones named are the main ones.

Dr. Beatty, for appellants, examined Lindahl and took his blood pressure; it was taken on both arms and showed a greatly elevated blood pressure, above normal; called it a severe hypertension; examined appellee's heart; found heart apex displaced, indicating heart enlargement; there was an increased thickness of the muscle wall of the heart, causing displacement; heart larger than normal; this thickness and heart enlargement were caused by maintaining high blood pressure over a period of years. Pulse rate was ninety-four. Appellee was paralyzed on left side; his mental attitude was foggy and he was unable to

give a clear picture of what had happened; he was confused.

Hardening of the arteries is a gradual process; it usually comes with old age but sometimes develops more rapidly in some people. Witness found no evidence of trauma. The injury was to the circulatory system in the brain. He thought the high blood pressure was of long standing, probably quite a few years. The condition found in appellee's arteries was a disease. The deterioration of the arteries and the elevation of the blood pressure or hypertension comes on progressively and gets worse progressively. It cannot be stopped. The history of such cases is that a great many of them ultimately reach a state where they have a stroke. The progressive increase in the blood pressure and advancement of the disease certainly have to do with a stroke. The higher the blood pressure is, the more danger that a vessel will be ruptured and a hemorrhage will result, causing pressure on the brain and paralysis:

"Q. Now, what is your opinion, based upon your examination, and taking into consideration the condition of this man's arteries and the hypertension you found, of which you have already testified, as to whether ultimately, in all probability, this man would have had a stroke just as he did, would be apt to have a stroke just as he did, whether he was at work or not? A. He would; he certainly would be apt to have a stroke. With his high blood pressure * * * he would be apt to have a stroke eventually even though he were not engaged in a strenuous occupation or suffered no physical violence that might produce it. A stroke such as this man had is a danger that anyone is subject to who has high blood pressure and not because he is in any particular occupation. * * * after a hemorrhage starts the stroke will manifest itself depends on how rapidly the hemorrhage occurred and the amount of pressure it developed. * * * that might be a matter of five minutes in a severe, rapid hemorrhage or it might come on slowly * * * or even as long as two or three days. * * * It might even occur when he was entirely relaxed and in bed asleep. Of course, it would be more likely to occur during exercise and the more violent the exercise the more likely it would be to occur. * * * The condition of this man's arteries and the hypertension were such that

walking a distance of two blocks to get his breakfast after getting out of bed is exercise that could cause or superinduce a stroke and such stroke could subsequently occur an hour or two afterwards. Any time he stepped up a foot or ten inches he had to lift his own weight that far and that is exercise."

On cross-examination he was asked:

"Q. I am asking you now if it is your opinion that he had such a high blood pressure that the exercise attendant upon lifting a package of that kind, in the manner I stated would tend to bring on a cerebral hemorrhage? A. I would say it was apt to then, just as it would be now or any other exercise at that time would probably have been apt to do it, as I stated it would at the present time. * * * Q. That would be more probable than that the cerebral hemorrhage had occurred while he was sleeping, wouldn't it? A. I don't believe I could say that honestly, because I have seen people in whom I thought it did occur sleeping, even though they had been active the day before. Q. You mean before they slept? A. The day before they slept they had been active and hadn't had a hemorrhage, but came on during their sleep."

A hypothetical question was asked Dr. Beatty and therein were included the activities of Lindahl from the time he got up from bed, walked two or three blocks to a restaurant, walked up one step into the restaurant, ate his breakfast, walked down the same step, stepped into an auto and rode seven to eight blocks to the warehouse, and also his activities at the warehouse up until he was taken to the hospital, and Dr. Beatty was asked his opinion as to the facts assumed, taking into consideration his examination, as to whether he could say positively what caused the stroke or whether it was due to many things or a number of things:

"A. It is my opinion, assuming those facts and that he had a hypertension, that the hypertension itself was the fundamental cause of the stroke and that any of the exercise he had had that morning up to the time, immediate time, when the first symptoms showed up, and going back perhaps 24 hours or more before that time could have been the activating cause, either

the lifting of the syrup at work or it might have happened without exercise. Walking from his home to the restaurant is exercise. I couldn't say positively which was the activating cause. Apparently if the assumption that you spoke of, that is the rate at which his trouble developed from the time he had difficulty rolling the cigarette papers until he was lying down, it apparently came on rapidly from the time of the first symptom. The symptoms had increased rapidly and that would indicate that it was bleeding rather rapidly into the brain. You can't have any symptoms until the pressure has developed so there would have to be bleeding sometime before any symptoms would develop. As to whether you would have pressure on there, sometime before, there would be any bleeding would depend on how distant the point of hemorrhage was from the nerves that are being paralyzed. If the hemorrhage occurred close to the nerve for instance, the pressure was on that part of the brain, the symptoms would begin to develop and as the pressure increased the pressure would become more severe."

Dr. Macrae testified he examined appellee and found a very high blood pressure; his left side was paralyzed; he found arteriosclerosis, which is always a factor in paralysis; this condition had pre-existed for years; the condition of appellee's arteries and blood pressure is a disease. The disease he had is progressive. There is no treatment for it. As the blood pressure goes up in the same relation to the weakening vessel wall a stroke will ultimately happen; as this progresses there is always a time when there will be a break. It might break at any time, like straining or any little thing that brings on a little more than ordinary exertion:

"Q. What do you say as to whether or not without any exertion that would progress ultimately until finally he would have had a stroke in all likelihood? A. Yes, they do. Q. What is the prime and proximate cause of a hemiplegia or stroke in a case like this * * *? Whether the condition of the arteries is the proximate cause? A. Yes, the arteries' condition is the proximate cause. The condition of the arteries together with the pressure, of course, are the cause. The arteries, of course, are always in the same relation to the pressure. Now vessels in

the brain, the theory is they have less support than vessels in other places and the vessels, particularly around the 'circle of willows' right at the top of the brain seem to be the weakest and when a vessel blows it is usually that vessel, the sylvian artery. It is a branch of the middle cerebral. When a man is active, of course, it raises his blood pressure which puts more strain on it for the moment, which is just enough to blow it up. Of course, this quite often happens when we get up in the morning. A lot of people take a stroke at that time. It would be hard to answer as to whether the exercise and exertion would be the cause of the claimant's stroke on March 13, 1943, where he got up about 6:30 in the morning and walked three blocks and then had his breakfast and then rode several blocks to his work and didn't start to work until after about 7:05 and his stroke became manifest about 7:25 in the morning. We do know it has been noted that a stroke often happens in a person maybe two or three days after an accident of some kind. That has happened so much so it is noted and I have seen a couple of cases of that kind where there would be an automobile accident and not much of any severity to it, but a couple of days later they would have a stroke. Q. Then when a man has a stroke, as to when it becomes manifest is that any indication or can you tell from that when the thing that activated it occurred? A. Not unless he is doing some active, hard work at the time. If a man were awfully mad and flew into a tantrum, that often happens at that time with weak vessels and then if a man were doing something awfully hard. But anything like this, nothing out of the ordinary I don't believe it can be established.''

A hypothetical question was asked Dr. Macrae, in which were included all of the movements of appellee from the time he arose March 13th until he was found in the cage of the spice room when he said not to call a doctor. Following this Dr. Macrae was asked:

''Doctor, what would you say as to whether a man would be apt to have a stroke with his arteries in the condition you found them and the pressure too, would be apt to have a stroke

under those conditions, whether due to those things or not? * * * A. Well, assuming that this is a daily routine there about the things he does, I wouldn't think activity of that kind would be conducive. It might happen at any time. Q. You may assume he did nothing that day that he wasn't accustomed to do and did it exactly the same way he had been doing it. Under those facts, what is your opinion? A. Well, I wouldn't think it had much to do with it. Q. At any rate, what do you say as to whether it would be a matter of speculation? A. It would be entirely.''

There was other evidence of the medical witnesses dealing to a considerable extent with cerebral hemorrhage, arteriosclerosis, apoplexy, paralysis, strokes, hypertension, and high blood pressure. A part was devoted to various theories: the cause and effect, what may or may not cause a stroke, and under what conditions and circumstances it may occur. The evidence of the medical witnesses was at some length and we have tried to give a brief synopsis of such as we deem controlling.

On the one hand, the appellee contends that the stroke which he suffered was brought about by his handling and loading the seven cartons of syrup on March 13th. It is claimed by him that by reason of the exertion involved in such loading a cerebral hemorrhage took place but that it did not manifest itself until some minutes later.

On the other hand, appellants contend that by reason of the fact that: the appellee had suffered for years from the disease arteriosclerosis; that it was a progressive disease which cannot be checked, resulting in high blood pressure or hypertension; that a stroke or apoplexy may occur at any time, with or without exertion, even when a person is relaxed and asleep in bed; also that by reason of the uncertainty of time when a stroke may take place, it is mere speculation or conjecture as to what may or may not be the contributing cause.

An examination of the testimony of the medical witnesses reveals that there were conflicts therein as to whether the injury to appellee arose out of or was in the course of his employment, and as to the time when and under what circum-

stances his injury took place. Some of the opinions by such witnesses seemed to be based in part upon speculation and conjecture. Following a careful study of the testimony of such witnesses we think that reasonable minds could arrive at different conclusions as to the time and cause of the injury. Under such conditions the finding of the industrial commissioner is conclusive. Under the record we hold that such commissioner had sufficient evidence before him upon which to base his holding.

III. Questions involving the rules of procedure under the Workmen's Compensation Act, the burden of proof, the necessary showing by appellee, the effect of the findings of fact by the commissioner, the jurisdiction on appeal to the district court, and the procedure there, are quite well settled.

Where there are disputed facts in the record the finding of the commissioner will control and in the absence of fraud his findings of fact are conclusive. Code, 1939, section 1452. On appeal the trial court may have jurisdiction if the commissioner acted without or in excess of his powers, or if it should appear that the facts as determined by the commissioner do not support his findings or order, or if there is not sufficient competent evidence in the record to warrant the commissioner in making the order appealed from. Code, 1939, section 1453.

For the appellee to obtain compensation for his disability he would have to show by a preponderance of the evidence that his disability was caused by a "personal injury." Code, 1939, section 1421. He must further show that his disability was one "arising out of and in the course of the employment." See section 1377, Code, 1939; Almquist v. Shenandoah Nurseries, 218 Iowa 724, 254 N. W. 35, 94 A. L. R. 573; Smith v. Soldiers' and Sailors' Memorial Hosp., 210 Iowa 691, 231 N. W. 490; Enfield v. Certain-Teed Products Co., 211 Iowa 1004, 233 N. W. 141; Kent v. Kent, 202 Iowa 1044, 208 N. W. 709, 710.

It is for the industrial commissioner to determine whether the appellee has met such burden of proof. Sparks v. Consolidated Indiana Coal Co., 195 Iowa 334, 190 N. W. 593; Bushing v. Iowa Railway & Light Co., 208 Iowa 1010, 226 N. W. 719;

Slack v. C. L. Percival Co., 198 Iowa 54, 199 N. W. 323; Webb v. Iowa-Nebraska Coal Co., 198 Iowa 776, 200 N. W. 225; Wittmer v. Dexter Mfg. Co., 204 Iowa 180, 214 N. W. 700; Murphy v. Shipley, 200 Iowa 857, 205 N. W. 497; Flint v. City of Eldon, 191 Iowa 845, 183 N. W. 344; Kraft v. West Hotel Co., 193 Iowa 1288, 188 N. W. 870, 31 A. L. R. 1245; DeLong v. Iowa State Highway Comm., 229 Iowa 700, 295 N. W. 91.

In the Enfield case, supra, the question involved was whether the injury complained of was in the course of the employment. This court, by Kindig, J., said, at page 1007 of 211 Iowa, page 143 of 233 N. W.:

"The burden of proof is upon the claimant to show that his injury did arise in the course of his employment. Jones v. Eppley Hotels Co. (208 Iowa 1281) * * * Griffith v. Cole Bros., 183 Iowa 415; Norman v. City of Chariton, 206 Iowa 790. Such are the essential prerequisites underlying claimant's right of recovery. Who is to determine those essentials? Manifestly, under the Iowa statutes, it is for the industrial commissioner to say whether the claimant has carried the burden thus cast upon him."

In Bushing v. Iowa Railway & Light Co., supra, this court, through DeGraff, J., said, at page 1018 of 208 Iowa, page 723 of 226 N. W.:

"Under the Iowa act, to justify an award, three things must be shown by the evidence, direct or circumstantial, including the reasonable presumptions and inferences drawn therefrom. These are (1) that the employee suffered an injury; (2) that the injury was sustained in the course of the employment; and (3) that the injury arose out of the employment. This court does not hold that, when an employee dies at his post of duty, a presumption arises that the death was one arising out of and in the course of the employment. This is a matter of proof, and the burden is on the claimant."

In Kraft v. West Hotel Co., supra, we said, at page 1290 of 193 Iowa, page 871 of 188 N. W.:

"It is incumbent upon the plaintiff in a compensation

action to establish his case by a preponderance of the evidence. * * * [193 Iowa 1294, 188 N. W. 873] It is unnecessary that we should review the cases that control. Sufficient to state that we recognize *stare decisis* in compensation cases. Findings of fact upon conflicting evidence or upon evidence upon which reasonable men may draw conflicting conclusions are within the clear purview of the statute making the order and decree of the industrial commissioner final and conclusive.'' Citing Pace v. Appanoose County, 184 Iowa 498, 168 N. W. 916; Rish v. Iowa Portland Cement Co., 186 Iowa 443, 170 N. W. 532; Pierce v. Bekins V. & S. Co., 185 Iowa 1346, 172 N. W. 191.

IV. While appellee has cited various authorities which he claims sustain his points as set forth, he places main reliance upon the holding of this court in Almquist v. Shenandoah Nurseries, supra, 218 Iowa 724, 254 N. W. 35. The trial court also relied strongly upon such holding in reversing the industrial commissioner. By reason of the reliance of both appellee and the court upon the holding in that case, we will examine it in order to arrive at the basis of its holding.

We think that the present case can be distinguished from the Almquist case. Almquist was employed by the Shenandoah Nurseries and his employment required him and other workmen to ''pull up and shake out'' barberry bushes. These bushes were pulled up and shaken out by use of a tree plow which loosened the roots, and then by the men breaking the dirt apart from the bushes. The bushes would sometimes bunch together with clumps of dirt weighing all the way from a few pounds to two hundred fifty pounds. When the bushes thus clung together and were supported by a clump of dirt the workmen pulled them apart by hand or pried them apart with a spade. If the bushes were especially large or securely entwined it required a hard pull to separate them. Almquist, while working, sank to the ground or ''keeled over,'' put his hand to the region of his stomach, and said, ''I am sick.'' He then started to an automobile and again sank to the ground. At the hospital an operation revealed that there was a perforation of the stomach through the center of an old ulcer of the stomach. This old ulcer was an inch in diameter and was

310

surrounded by scar tissue. His death followed, being caused by "empyema" due to "pus forming after a complication of perforation" of an ulcer.

In that case the employer claimed that the record failed to show that the employee at the time in question was doing heavy work. In discussing this claim, this court said, at page 734 of 218 Iowa, page 40 of 254 N. W.:

"The work was exceedingly heavy because it required much lifting, pulling, and prying. * * * But a careful reading of the entire record reveals without contradiction that he was doing heavy work at the time he sank to the ground. As a matter of fact, there is no substantial evidence to the contrary even when considering the inferences to be drawn from evidence. Because the work was so heavy, the men who did it were called 'the bull gang'. Such heavy work caused a straining of the stomach of the man who performed it."

Dr. Wirsig, who attended the employee, testified that the strain incident to the work was the *"proximate and only cause* of the perforation of the stomach." (Italics supplied.) He further stated that there would have been no perforation had it not been for the strain of the work and that the ulcer itself would not have perforated naturally, but that the perforation necessarily came from the work. Further, this court said:

"Manifestly, therefore, the straining in doing the work caused the personal injury to the employee."

Dr. Wirsig's testimony as above set forth was uncontradicted. This being true, it was not necessary for the claimant to prove any other special incident or any other unusual occurrence.

Further, in the Almquist case, this court said:

"In the case at bar the personal injury was proven when it was shown by the record that the perforation of the employee's stomach did not result from the natural processes of nature, but occurred only because of the heavy work, and that such perforation arose out of and in the course of the employee's employment."

On page 732 of 218 Iowa, page 39 of 254 N. W., this court said:

"A personal injury, contemplated by the Workmen's Compensation Law, obviously means an injury to the body, the impairment of health, or a disease, not excluded by the act, which comes about, not through the natural building up and tearing down of the human body, but because of a traumatic or other hurt or damage to the health or body of an employee."

Further, on pages 736 and 737 of 218 Iowa, page 41 of 254 N. W., this court said:

"Nowhere in the record is there any dispute on the material facts. Consequently, the appellee, without controversy, proved that there was a personal injury which caused the employee's death, and that the same arose out of and in the course of the employee's employment. Hence, the commissioner erred as a matter of law in finding that she was not entitled to compensation, and the district court properly reversed him. See section 1453 of the 1931 Code."

A careful study of the Almquist case and the present case reveals a wide divergence in the facts. In the Almquist case the court properly held that the injury was due to the heavy lifting, the excessive strain, resulting in a perforation of an old ulcer. That such caused his injury was undisputed. We think that the facts in the two cases are so different that the holding there does not support the claim of appellee. It seems to us that that holding is authority here for the claim of appellants.

V. As indicated earlier, there was evidence that with a disease existing a stroke might happen at any time, regardless of exertion or occupation; that the disease was progressive: there was no cure, no hope of improvement; that the blood vessels gradually became weakened, and that a stroke of apoplexy might happen at any time. There was evidence that the stroke usually follows a strain, heavy lifting, or overexertion; that if a blood vessel ruptures and a cerebral hemorrhage follows it may happen at once or may be delayed for hours, even days.

An examination of the medical testimony heretofore set out reveals a disagreement between the witnesses as to what caused, could have caused, or might have caused the stroke of apoplexy. All agree that appellee had arteriosclerosis, or hypertension. They are in disagreement as to whether the moving of the cartons did cause or could have caused the stroke. All agree that the moving of the cartons would cause exertion, but disagree as to whether such exertion was the proximate cause of the stroke. In view of such conflict we hold that the finding of the industrial commissioner is controlling.

It is true that the employer's liability under the compensation act is not avoided or lessened by reason of the fact that appellee sustained no wound or bruise or other hurt of a traumatic character. Black v. Creston Auto Co., 225 Iowa 671, 676, 281 N. W. 189; Dille v. Plainview Coal Co., 217 Iowa 827, 847, 250 N. W. 607; Gay v. Hocking Coal Co., 184 Iowa 949, 956, 169 N. W. 360. Likewise, an injury may be compensable even though it does not arise out of an "accident" or "special incident" or "unusual occurrence." Almquist v. Shenandoah Nurseries, supra; Littell v. Lagomarcino Grupe Co., 235 Iowa 523, 530, 17 N. W. 2d 120, 123.

Various other questions have been presented in this appeal. In view of the conclusion at which we have arrived, we deem it unnecessary to set them forth herein.

Following a careful study of the record we hold that there was substantial evidence in the record to sustain the finding of the industrial commissioner denying the claim of appellee, and that the district court was in error in setting it aside.—Reversed.

HALE, C. J., and OLIVER, BLISS, WENNERSTRUM, GARFIELD, SMITH, and MULRONEY, JJ., concur.

MILLER, J., takes no part.