AGNES GIFFORD, appellant, v. IOWA MANUFACTURING COMPANY, employer, and IOWA MUTUAL LIABILITY INSURANCE COMPANY, insurance carrier, appellees.

No. 47855.

(Reported in 51 N.W.2d 119)

JANUARY 8, 1952.

Doran, Doran, Doran & Erbe, of Boone, and Fisher & Fisher, of Cedar Rapids, for appellant.

Steward & Crouch, of Des Moines, and Jordan & Jordan, of Cedar Rapids, for appellees.

BLISS, J.—The determination of this appeal depends largely upon the facts and they must be set out in considerable detail. The deceased, Clayton Gifford, about forty-two years old, was a welder by trade, but operated a farm near Pleasanton, in Decatur County, Iowa, during the farming season, and worked at his trade in the late autumn and winter. He had been afflicted with diabetes for many years, but took insulin to control it. Sometime prior to March 3, 1947, his physician at Leon, Iowa, Dr. K. R. Brown, sent him to the Department of Internal Medicine, at the University of Iowa, for examination and treatment. On March 3, 1947, Dr. J. D. Gordon of that department sent a

report by letter to Dr. Brown of his findings, treatment and recommendations concerning the patient. It confirmed his diabetic condition and stated the dosage of insulin which he should take daily. It stated that the physical examination revealed a well-preserved man who seemed rather slow mentally; the Department of Neurology was of the impression that there was a possibility of neurological disease, but no definite neurological diagnosis was made; that an ulcer on his left big toe had been there for two years and was draining some; and "the neurological examination revealed the absence of the lower deep reflexes at the knee and ankle *and definite impairment of pain sensation over the toes and questionably so over the calves of both legs.*"

On November 7, 1947, the employer had a doctor make a physical examination of Clayton Gifford, and the detailed results thereof are shown on a blank form introduced in evidence. Diabetes is not mentioned but sugar in the urine is noted. One of defendants' medical experts testified that had he made the physical examination he would have known that the subject was diabetic. There is no contention that the employer did not know it. Gifford began working for the employer-defendant on November 7, 1947, and his last payday was November 30, 1947, at which time his total pay, before deductions, was $153.44. He was one of a number of welders using electric welding equipment. The employees worked in three eight-hour shifts. He and about thirty others worked in the welding department on the second shift from 3:30 p.m. to about midnight. The welding department consisted of a series of booths, each about 12 feet square, the sides of which were of canvas on pipe frames, with one side open. The booths adjoined each other, and each welder had a separate booth. There was an iron table about 2' high; 3' long and 2' 9" wide in each booth on which the workman performed his welding operations. Other workmen brought in the object or articles to be welded. If they were not at a high temperature when brought in, they became very hot from the welding rods or electrodes used on them. The larger and heavier articles cooled less rapidly than the smaller and lighter ones. The welders wore heavy leather gloves to protect their hands from heat and sparks. When the welding operation on each article

was completed the welder placed it on the floor of his booth, and sometimes the booth floor became more or less cluttered before the articles were removed by other workmen. The employer was engaged in making heavy machines and equipment largely of metal, such as stone crushers, asphalt mixers and other road-building apparatus. The handling of these heavy metal materials. and the noise of the factory's operating machinery were so loud and continuous that it was with difficulty that a person could make himself heard.

On Friday, November 21, Gifford went to work in his booth at about 3:30 p.m. He was working alone, as usual. The workers on the shift usually stopped for lunch between seven and seven-thirty o'clock each evening. Another welder, Raymond Bonebrake, worked in the booth just north of Gifford's booth. He was a witness for the claimant in the hearing before the deputy commissioner. He was asked if it came to his attention that afternoon that something had happened to Mr. Gifford. He answered in the affirmative. He was then asked to state what he saw or what he heard Mr. Gifford say at the time the accident happened. Defendants objected that the inquiry as to what Mr. Gifford said was "incompetent and calling for hearsay testimony, and no proper foundation laid for its admissibility as res gestae." It was agreed that the same objection might stand as to all other inquiries to the witness concerning conversations with Mr. Gifford. The witness testified in substance that: before lunch time, about six or seven o'clock, he passed through Gifford's booth on his way to get some electrodes and Gifford showed him he had burned his right foot, and he asked him how he did it and he told him; he said it had happened a couple of hours earlier; Gifford called his attention to his right shoe; it was discolored and lighter, colored as heat would do; he said he was welding this small heavy piece, and "the piece had so many angles and so much welding, the area was not large enough to carry away the heat, so it stayed hot a long time after he was through, and after he finished welding, [he] brushed it from the table onto the floor and unknowingly when he started the next piece of work he put his right foot against this hot metal, and he did not know he was burned until it was too late, and then he couldn't get his shoe off quick enough."

The witness said he saw the piece of metal that Mr. Gifford was talking about and that it was flat with upright angles; it was still there and Gifford showed it to him. He said he saw the shoes which Gifford had on and that they were high work shoes. He said he saw and talked to Gifford everyday afterward, including the last day he worked. He complained that he was not feeling well, as if "he might have the flu or something like that. He did not elaborate much about the foot." He said he was in Gifford's booth about five minutes and that each then went on with his work; that he did not see Gifford when he put his foot against any hot metal; that he did not hear him make any outcry or exclamation, and that it would have to have been a scream or loud outcry to have been heard.

Another witness for claimant at the same hearing was Orville McShane, a welder working on the same shift with Gifford. He said the last time he saw him was the day before or the day after Thanksgiving when he came to get his tools. For about three days before that Gifford would stop at the booth of the witness and say that he was going to the nurse to get his foot dressed. It was at this time that Gifford told the witness that he had burned his foot on a piece of hot iron. The witness also testified that after Gifford's death he overheard Ronnie Schuler, the personnel manager of the defendant Iowa Manufacturing Company, and an insurance man talking, and "I heard one tell the other they had a statement from Gifford's doctor at home and the death was caused by the burn on the foot. I couldn't swear which one of the two men made that statement."

While Mr. Gifford was in the employment of the defendant company, he, with six or more other roomers, lodged in the home of Mr. and Mrs. Carl Solbrig in Cedar Rapids. He was rooming alone. Mrs. Solbrig was a witness for the claimant at the hearing before the deputy commissioner. She testified that while Mr. Gifford was working for the defendant Iowa Manufacturing Company she went to his room one afternoon in the latter part of November 1947 (the exact date she did not remember) and Mr. Gifford was there and told her he was hurt. There was no objection by defendants to that question or the answer. After

three other questions were asked and answered, without objection, she was asked: "Did you ask why he wasn't at work that day? A. Well, he said he had to come home that day, he had been hurt." Defendants' motion to strike the words "he said he had been hurt" as incompetent and hearsay was sustained by the deputy commissioner. The witness then testified, without objection:

"Q. Did he show you the shoe he had been wearing? A. Yes, he did. Q. What kind of a shoe was it? A. Well, I don't remember just exactly what kind of a shoe it was. [It was a work shoe.] What attracted my attention was the hole in the shoe where it had been burned. Q. Which shoe? A. As I remember correctly, on the right foot, over the small toe, the little toe, on the outside. Q. Had you seen the shoe before that? A. Yes, they were shoes he had been wearing, I am pretty sure of that."

The witness fixed the date of this conversation as about a week before November 30, when he was taken home, or about November 23 or 24. The witness testified to certain observations she had made of Mr. Gifford "after he was hurt." The quoted words were stricken on motion of the defendants.

The witness testified that when Mr. Gifford became sicker and more disabled she telephoned his wife and she came and took him home. Mrs. Solbrig testified that during the last week that Mr. Gifford was in her home she saw the bandages on his foot, and that she had to change the sheets because of bloodstains on them that came from his foot.

On the cross-examination of Mrs. Solbrig, she testified:

"Q. Did I understand you to say you saw a burned area on his shoe? A. Yes sir. Q. Were those the shoes he regularly wore to work? A. Yes sir, I think they were. Q. Had he worn them to work all the time he was there? A. I couldn't say to that because I had not paid much attention to it. I noticed it was the burned shoe he had been wearing. Q. What did this shoe he had been wearing look like? A. It was like leather being burned. Q. What color were his shoes originally? A. Well, I couldn't say as to that. It seems to me they were brown. * * * At one time I thought he was under the influence of a drug or

liquor. He said no he didn't drink, took insulin for, I think, diabetes. When he was under the influence of the drug he appeared to be dopey, otherwise normal. The bloody discharge on the sheets when I changed them was down near the foot of the bed and I saw it * * * to the time he left. I noticed it because I had to change the sheets on the bed."

All set out in the paragraph just preceding was in cross-examination by the defense. The deletion indicated just above by the last three asterisks were the words "from the time he was hurt." The defendants challenged the statement, thus: "Move to strike that part of the answer as to when he was hurt as being incompetent, hearsay, opinion and conclusion of the witness, and not responsive to the question." We cannot ascertain from the record whether the answer was responsive or not, as the question is not shown. The matters mentioned in the narrative statement just above indicate it was probably the response to more than one question. Her testimony that Gifford told her he had been hurt was hearsay, but her answer that he was hurt had a factual basis. She knew that he had been working for the employer-defendant everyday. He came from work with his right foot bandaged. She took care of his room and made his bed and changed the linen on it. Prior to the time he returned with a bandage on his foot, which she saw, there had been no bloodstains on the sheets at the foot of the bed. Thereafter she observed the bloodstains as she changed the sheets and made the bed until he was taken to his home. From a man who was able to and did work at his trade daily he became progressively disabled until he was unable to leave his bed. She brought what little food he was able to eat.

Ruling on the objection the deputy commissioner said: "Well, in any event go ahead. Try and fix the number of days, irrespective of the hurt part, please. A. I think it was about the 23rd or something like that. I couldn't tell you, I don't remember the date he was hurt, to be exact. You want the truth don't you, and I want to tell you."

Defendants' motion to strike the part of the answer relative to when he was hurt as an opinion and conclusion of the witness was sustained by the deputy commissioner.

The employer had a first-aid department in charge of a nurse who had graduated in 1925 and thereafter served in various hospitals and on private duty. She had been with the employer since October 1, 1945. She was on duty with the second shift in November 1947. Everyone hurt was expected to report to first aid. Notation was always made on a loose-leaf notebook of employees reporting for aid. Mr. Gifford was never available as a witness, since he died on December 7, 1947. The nurse was therefore called by claimant as a witness to show notice to the employer and to identify and bring her reports respecting the calls upon her by, and the aid given to, Mr. Gifford. She presented five sheets of paper which had been detached from her notebook record. The notes were sketchily condensed and in her handwriting. Exhibit 3 was one side of a sheet. At the top was written, "Monday, Nov. 24, 1947." Below the date were reports on aid given to three others. Each notation bore a number, respectively "#687, #814 and #595."

The last notation on the sheet, and in the form just as written, is as follows:

"Weld Gifford Clayton #610
Fifth toe right foot, thinks
burned Friday night. did not
        blister then
know till Sat. large Blister
· Broke. A and D ointment
and Dressing applied. says he
applied powder. Thinks stood
        by piece he welded"

When this was read to her by claimant's attorney and she was asked if it was a part of her official report and in her handwriting she stated "That is correct."

The witness was then asked if she knew whether the records of the company showed whether Mr. Gifford reported to the nurse on the first shift in charge of first aid between the 24th and the 28th to have the foot dressed—"A. I know that he did not. Q. You know that he did not. So far as the record is concerned do you know that? A. There never was anything on the record

or Mary would have said." Claimant's motion to strike out what Mary said as an opinion and conclusion was sustained.

Exhibit 4 was one of two sheets and at the top of each was written "Friday, Nov. 28, 1947." The next to the last entry on the second sheet, and in the form as written, is as follows:

> "Weld Gifford Clayton #610
> not
> Toe Dressed. Complains of
> T P R
> sore throat 102 - 90 - 24
> Feels chilly, throat swabbed
> 1/c glycerine merthiolate.
> Told we would take him
> (order made)
> to his room (Dr. Hamilton)."

The word "not" is written with a slant upward and to the right between the words "Toe" and "Dressed". The witness explained that the letters above the figures in Exhibit 4 meant respectively "Temperature", "Pulse" and "Respiration". Being asked if the word "not" was written on November 28, 1947, the witness answered that it was and was in her handwriting. Asked "How does it happen it didn't follow the usual line?" she answered, "Sometimes I just happen to do that. The other one is sort of crisscross."

Exhibit 5 was then presented to the witness. It was a printed form with various headings and blank lines for data. In larger letters at the top of the form were the words "Individual Accident Report, Iowa Manufacturing Company". It gave the name of Mr. Gifford with November 7, 1947 as the date of employment, and the date of his accident as November 21, 1947, while working on the second shift; the substance of Exhibit 3 was stated, but no mention was made of a burn; the time of receiving first aid on Monday, November 24, was given as 3:32 p.m. In answer to the query as to "exactly" what part of the person was injured and the extent of the injury it was stated: "Blister of 5th Toe Right Foot Burn?". The name of his doctor was given as Dr. Brown of Leon and the hospital as the Decatur County Hospital. It stated that the foot was dressed on

Monday, Tuesday and Wednesday and ointment applied. It also stated the substance of Exhibit 4 about the treatment of Mr. Gifford on Friday, November 28. The witness testified: "I made a report, claimant's Exhibit 5, and sent it to the insurance company. They sent it to the industrial commissioner. These were their instructions. Later I gave a statement to the insurance company. * * * I signed the report on behalf of the employer December 4, 1947."

We have set out all of the direct examination. She was cross-examined at much length concerning conversations with Mr. Gifford and other matters not appearing in her written notations nor gone into on direct examination. Many of the interrogations were quite leading. The witness testified that on the first treatment on Monday afternoon, November 24, this conversation took place: "I said, 'you said you thought you burned it. This doesn't look like a burn.' I questioned him: 'Did you have a thread in your stocking that rubbed your toe? It looks more like something that rubbed from your shoe, or thread, that caused the blister. What makes you think you burned it?' He said, 'I don't know. The only thing I know, I felt I might have stood against some hot metal.' "

Continuing on cross-examination, the witness, describing the appearance of the toe on the first examination on the 24th, said:

"The top of the dorsal surface of the little toe apparently had had a broken blister on it. In other words, the skin was broken, and it was completely off that toe at that time. There was no sign of the skin that would have composed the blister, as it were. I saw no indication of pus, no inflammation or infection at that time. The skin was white or a very pale pink on the place where the blister had been. I put some A & D ointment, applied a dressing because it was a soothing ointment and good for healing. The ointment is not exactly an antiseptic. Gifford said when I first saw him he thought he had burned himself. I said it didn't look like a burn to me. He said he didn't feel anything at the time, but the first thing he knew was Saturday when he noticed a blister on the little toe. His shoe was split and he said he had cut it to relieve the pressure. I saw

no indication of a burn on the leather of that shoe. * * * I said, 'You better come back before you go home tonight and let me see how it is.' He came in and I looked at it about 11:30. Q. Did you make a notation in your book? A. We don't usually do it. Q. What do you do? Just make your entry on the first call? A. Uh-huh, unless there is some particular change we don't make the second entry. Q. So when you told Mr. Doran you always make those entries when somebody comes in you meant on the first call? A. Yes, unless there is some change of condition we make a note of it. Q. When you dressed that right little toe again about 11:30 on that Monday night, November 24th, as you remember it, was there any appreciable change in its condition? A. No, there wasn't. Q. What did you do to it again? A. Took off the dressing and put on a fresh dressing. Q. Did you apply some more of the A & D ointment? A. I couldn't say whether A & D or boric. I know I used either A & D or boric. Q. When you saw him the second time on the 24th, was there any pus? A. No. Q. Or any drainage? A. No. Q. Any indication of infection? A. No, there wasn't. Q. What is your ordinary practice there if an infection develops in a wound or injury? Do you continue to treat that injury or infection or send to a doctor? A. I immediately try to get in touch with the doctor, and if not able to get in touch with the doctor, to St. Luke's until I do get the doctor."

The witness testified that she saw Mr. Gifford on Tuesday, November 25, at sometime between 4 and 4:30, and applied a new dressing:

"Q. Was there any change in the condition of the little toe then? A. I would say no. Q. Was there any pus or infection or drainage from it at that time? A. There wasn't. Q. Did you from time to time as you dressed this toe question him about whether there was any pain from it? A. I did, yes. Q. What answer did you get? A. He told me it felt good, the dressing felt good. Q. When you removed the old dressing and put on a new one, was there any discharge on the old dressing? A. No, there wasn't. Q. Was that true on every occasion? A. Yes, it was."

156

The witness testified that she saw Mr. Gifford again on Tuesday, the 25th about 11:30 p.m. and put on a fresh dressing of "either the A & D or boric. I know I used both on that before he went home."

The witness saw Mr. Gifford twice on Wednesday, November 26, 1947, in the afternoon about 4 to 4:30, and again about 11 or 11:30, and put on fresh dressings:

"Q. What was the condition of his right little toe at the time of those two dressings on Wednesday? A. On Wednesday there was sort of a little dry spot on the top of the little toe, sort of like it was healing a little, a little pinkish tinge I would say. Q. Aside from that was there any change from his condition on Wednesday? A. No, there wasn't. Q. Did you ask him how it felt? A. Told me it felt good. Q. Was there any pus or drainage at any time on Wednesday? A. No, there wasn't. Q. And when you removed the old dressing was there any drainage or pus on it? A. No, there wasn't. Q. Did you examine or dress his toe on Friday, November 28th? A. I did not. Q. Did you ask him anything about his little toe on Friday, November 28th? A. I asked him how it felt, and he said it felt fine. Q. Did you look at it then on that day? A. No, I didn't. Q. So when you recommended on Friday he go to a doctor, was it with reference to the condition of his toe, or the condition of his throat and temperature? A. The condition of his throat and temperature and the fact he felt chilly. I felt definitely he needed a doctor. * * * Exhibit 5 is the printed form used for all complaints of occurrences. Q. You had no knowledge of any accident having occurred? A. No, I didn't, just his statement. Q. All you had was his statement that he thought he had burned it? A. That he must have stood against this hot metal."

Plaintiff's redirect examination of the first-aid nurse was confined largely to the insertion of the word "not" in the statement "toe *not* dressed" in Exhibit 4 and later copied into Exhibit 5. The witness testified that the three words were written at the same time when she wrote the entry in her loose-leaf notebook on Friday, November 28, 1947:

"Q. I want you then to look at it closely, and see the differ-

ence in the lead-pencil writing in the word 'toe' and 'dressed' and the word 'not'. Will you please do that for me? A. I evidently changed pencils when writing on that carbon paper. Yes, I do. Q. You think you wrote the word 'toe' with one pencil, wrote [reached] over and grabbed another and wrote the word 'not'? A. I don't think there is much difference between, I don't know whether I changed pencils or not. I evidently did change. Q. Look at the word 'toe' and look at the word 'dressed' on Exhibit 5. You are reasonably certain those two words were written with the same pencil, aren't you? A. I don't know. I could not say. Q. They appear to be the same, don't they? Now, I call your attention to the word 'not'. It is a little different shade of lead used in writing that word, wasn't it? A. It is not necessarily a different shade of lead, could be the same. I might [have] had a different slant or used a different pencil. Q. Are you telling the court that the word 'not' is written with the same pencil as the words 'toe' and 'dressed' on Exhibit 5? A. I couldn't answer that. I don't know. * * * I know I didn't dress his toe on the 28th. I didn't see the toe on the 28th. I told him he could go and see the company doctors as a private patient. I didn't feel it was a burn, so I didn't feel it was the company's case. I dressed the toe six times, but my records showed only one dressing on Monday, November 24."

The nurse's written notations or records contained no references to the great part of matters elicited in her cross-examination. They contained no mention about the presence or absence of pus, drainage, infection, or of conversations with Gifford. She had no notes to refresh her recollection as a witness testifying over two years after the occurrence of the numerous matters she detailed. The theory of the defense was that the inception of the infection was not in the right little toe of Mr. Gifford, but in his throat or elsewhere. The record shows that the efforts of the defendants were very largely devoted to the establishment of that theory. It is evidenced by the cross-examination of the nurse, in the persistent and specific direction by her interrogator, of her attention to the absence of everything in the condition of the right foot or right little toe of Mr. Gifford which might indicate infection. The comment and the finding

of the industrial commissioner indicate his appraisal of the testimony of this witness. The elicitation of testimony in this manner from a friendly, interested and co-operative witness, which goes to the very core of a case, substantially depreciates its probative value. This is particularly true when there is much evidence to the contrary.

The record shows, by concession, that the employee was receiving a gross wage of $55 a week for a week of five eight-hour days terminating on Friday at midnight. His gross pay for his last week was $32.88, indicating he worked three days, Monday, Tuesday and Wednesday, the 24th, 25th and 26th days of November, 1947. On Saturday, November 29, he was so sick he asked Mrs. Solbrig to telephone his wife, as he needed her. The telephone call was made that day, and Mrs. Gifford, her son James R. Gifford and daughter-in-law drove up early Sunday morning. They stayed until noon of Tuesday, December 2, when they took him to his home. (Note. They left in fact on Monday, December 1.)

James R. Gifford was a witness for claimant in the hearing before the deputy commissioner. On direct examination he testified that he saw the shoes his father had been wearing at work, and he recalled in particular that the right shoe was burned. Defendants' objection that the answer was an opinion and a conclusion was sustained. It was his opinion, but it was one concerning a subject matter which he as a layman might properly give. Grismore v. Consolidated Products Co., 232 Iowa 328, 344, 5 N.W.2d 646. Asked to just describe the shoes, he answered: "It was a pair of brown work shoes and on the right one was a hole about, Oh—so long—I imagine an inch and a half by a half inch, it was uneven and was charred." Defendants' motion to strike the words "it was charred" as an opinion and conclusion of the witness was sustained. The ruling was erroneous. He testified that the hole, with reference to the right little toe, "would be right by that—behind the little toe, or right with it", and that the hole was clear through the leather. He testified his brother had burned the shoe. Asked if he knew why, he answered, "No, not really. I imagine for sentimental reasons, maybe." He did not know when it was done.

Richard Gifford, the younger of the two Gifford children, was a witness for claimant. On direct examination he testified that he was home when his father was brought there from Cedar Rapids in a car; that his father's foot was bandaged; he saw his father's old clothes and brown work shoes he had when he came from Cedar Rapids. Asked to describe anything unusual about the shoes, he answered, "A hole was burned through on the right shoe." The answer was stricken on defendants' motion that it was an opinion and conclusion. The ruling was erroneous. Asked by the commissioner to describe the shoe, the witness said, "It was a plain brown work shoe with a hole burned in it." Defendants' motion to strike was not ruled on, and the commissioner again asked him to describe the shoe. He answered, the hole "was about an inch or inch and a half long, narrow, jagged and burned." Defendants' motion to strike was not ruled on. "The commissioner: Can't you avoid using the word 'burned'? Just describe it if you will." He answered, "it was jagged and scorched." Defendants moved to strike the word "scorched" as an opinion. There was no ruling. Upon the suggestion of claimant's attorney that "those words are all descriptive" the commissioner said: "Well, it would make a better record if you had it described." Asked if he had ever seen burned leather, he said he had and that the edges of the hole in the brown leather shoe were black. He testified that these old work clothes and work shoes of his father had been kept around the home for about two months. Asked what had happened, he answered: "Well, one day my mother went to town and my dad's stuff—old work clothes and shoes—were around there and she always saw them there and she felt kind of bad, and I just destroyed them, burned them up in the stove. It was before I knew there would be any contest on this claim."

Mrs. Agnes Gifford, the claimant, forty-five years old, was a witness in her own behalf. She testified on direct examination of the telephone call from Mrs. Solbrig on the last day of November 1947 and of going to Cedar Rapids and finding her husband in bed, with his foot bandaged; that he told her it had been burned. The commissioner ruled that defendants' motion was good as to what her husband told her, but for her to go ahead. She testified:

"We undone his foot and looked at it and it was swollen, red and burned on the little toe, and the whole toe looked like the skin had been pulled off of it and it was an ugly color. He said his foot was bothering him terribly, he was hurting bad and he wanted to go home and see Dr. Brown. His leg was swollen clear to the knee at that time. I took him home the next morning, arriving home about evening on December 1st, and called Dr. Brown right away. Dr. Brown examined the foot—the right foot."

She described the size of the hole in the right brown work shoe "and it was charred black, and, you know, how a burn frayed on that shoe." Defendants objected that the word "charred" was an opinion. The commissioner did not rule, but said it would be better for the record if she could describe it. It was agreed the objection might stand to like testimony. Asked how she could tell it was burned, she answered, "because it was black and charred." Asked to describe her husband's right little toe when the doctor took the bandage off, she replied: "It was a red, ugly burn, that is what it was. The blister, if there had been one, it had broken and it was like raw meat. It was just burned." She testified that it was in the middle of February or. so when her son burned the shoes, "I had cried over them so much he said he had burned them because he didn't want me to see them any more."

Dr. K. R. Brown, of Leon, Iowa, a physician and surgeon, who graduated at Northwestern and finished his internship at the Iowa Methodist Hospital in Des Moines in 1934 and had been engaged in general practice since, testifying on direct examination for claimant, said:

"I saw Mr. Gifford the morning of December 2nd in bed at his home. I examined his right foot and found it greatly swollen and inflamed, bandaged and the area overlying the little toe at the side was black and dry. The swelling extended upward along the ankle and leg and gradually disappeared. I cleaned up the foot and dressed it that morning. He told me he had a weld burn on his foot in that area." (To defendants' objection of incompetent and hearsay the commissioner directed the doctor to answer.) "Q. Was there anything to indicate to you as a

doctor at that time that there was evidence of a burn? A. It certainly looked so to me. It looked like a searing burn. Just lateral to and along the side of the little right toe." (His testimony, set out in narrative form, continued):

"I took his temperature and he had a high fever. I took him directly to the Decatur County Hospital at Leon, a distance of twelve miles, on December 2nd, and I saw him several times a day from then on. When he. arrived at the hospital I made a more extended examination, the essential findings of which were the acute inflamed infection of the right foot apparently centering from the burned area. There was, I believe, in the toe next to the great toe which was not burned, but which had an infection and inflammation in that area also. His foot and leg were swollen, red, and he had a high fever and was very toxic; he was very ill; short of breath and working hard to get his breath. His pulse was rapid and not strong, but regular. These were my positive findings: Q. During that diagnosis did you learn that he had been burned at the plant where he worked at Cedar Rapids?" Ruling on defendants' objection to the question that it was leading and suggestive, the commissioner stated, "You may answer." The answer was: "The information as to where he was burned was given me by the patient as a part of the history while I was examining him out in the home and at that time I examined his foot and so far as I could discover he definitely had a searing burn on the right foot alongside the small toe." Defendants renewed the previous motion to strike and the commissioner ruled that the answer remain subject- to the motion. "Q. Independently of what he told you, in your examination of Clayton Gifford's right foot did you find evidence of a burn?" After objection that the question called for an incompetent opinion and conclusion, and was leading and suggestive, the commissioner permitted the witness to answer that "It looked like a burn to me." (Motion to strike was denied.) "Q. It was your conclusion that it was a burn? A. Yes." (There was no ruling on the renewal of the objection and motion to strike.) Continuing, the witness narrated: "I determined the condition from which Gifford was suffering was an acute infection in the foot complicated with diabetes, and I considered the possibility of septicemia, which infection spread to other

162

parts of the body, in view of the gross and ultimate findings. Infection was overwhelming and spread elsewhere extensively. *I did not find any evidence of sore throat on Gifford at all and from the first time I saw him until he died I neither found nor treated him for any infection of the throat or otherwise."* (Italics ours.)

The witness testified that he treated the patient with penicillin, sulfadiazine, diabetic diet, intravenous fluids, and later a transfusion, but "he made no stable improvement, he had his ups and downs, but essentially a downward course and rather rapid. I signed a death certificate, Exhibit 11. In my opinion the cause of Clayton Gifford's death was septicemia, secondary to an infected burn, and that is what I stated on the death certificate I filed with the Department of Public Health of this State."

The certificate of death states among other matters: "Date of death Dec. 7, 1947. Immediate cause of death—Septicemia due to infected burn of right foot. Other conditions—Diabetes mellitus."

The witness testified with reference to the physical examination record of Gifford, prepared by Dr. H. H. Hamilton at and just prior to his employment by the defendant-employer, that the letter "T" just after the word "sugar" indicated sugar in the urine.

Asked to describe the condition of Mr. Gifford from December 2 to his death on December 7, with respect to his right foot and leg, Dr. Brown testified:

"It was swollen and inflamed. Over the small toe to the side was a blackened area that had the appearance to me of a searing burn. The ankles were swollen and there was some kind of pathology in the second toe, the toe next to the great toe, which when I first saw him was not discharging any pus, but was involved in the swelling, and later, before his death, probably after he had been in the hospital three days or so, began to discharge purulent matter in rather great quantity. There was no discharge when I first saw him on December 2nd. In general any diabetes infection of any kind or trauma of any kind is liable to make diabetes temporarily worse and conversely

contribute to severity of the infection. It is very serious for a person suffering from diabetes to suffer from a burn or injury, especially in the presence of an infection and even in the absence of an infection because the circulation is quite a factor in the extremity. * * * Gifford had a lymphangitis which causes red streaks to go up the surface of the leg. These indicate the presence of an acute spreading infection and a warning that the next stage will be septicemia. I did not treat him for a sore throat or infection of the throat or know that he had a sore throat during the time he was in the hospital. Prior to his death he had a very extensive swelling, not just confined to the one leg, but had generalized edema that goes with this toxic condition and approaching death."

On cross-examination Dr. Brown testified that Mr. Gifford "was chilling and had a high fever", which may be symptoms of flu or of septicemia or of many things.

Dr. Brown was present on December 11, 1947 at an autopsy conducted on the body of Clayton Gifford by a pathologist from the Methodist Hospital at Des Moines, and he also received a copy of his report. It was introduced as an exhibit by defendants. Cross-examined on this report, Dr. Brown testified:

"I see what Dr. Birge [the pathologist] described as a thick black eschar on the right little toe. That is the same thing that I described in my testimony as black and dry. When I first saw that right little toe it had this black thick eschar over it. It was black when I first saw it. It was not discharging pus. At the autopsy I observed the sinus or open lesion on the right second toe. Q. And that, I believe you said, was badly swollen and inflamed when you first saw Mr. Gifford? A. No, I don't believe that is quite the way I put it, or quite accurate. It was certainly not normal when I first saw him. It was nothing like it was, as swollen or inflamed as it became later, and it was not draining at that time. Q. There was infection and inflammation in the area there of the right second toe at the time you first saw him? A. There was inflammation I would say and I don't think at that time that one could say whether there was or wasn't pus in there. Certainly at that time I don't know that there was pus in there, and the foot was inflamed to the

164

extent that it would be hard to say where the inflammation from one area quit and another began when they were so close together. The whole foot was swollen when I first saw him. It isn't a fact that there was more inflammation and indication of infection in the area of the second toe than in the area of the little toe, not when I first saw him I am sure. Upon autopsy when pressure was applied to the sole of the foot, pus erupted from the second toe. There was a draining sinus there and that was present before autopsy, naturally. It would be a reasonable inference that it showed there was a direct connection between the sinus and the second toe, and this swelling and pus and infection in the sole of the foot. * * * I never drained the right little toe. There was no occasion to drain it. It was dry when I saw it. I did drain the right second toe considerably later, probably around a couple of days before he died. Q. The only thing you did for the right little toe in the way of medicine was warm moist dressings? A. No. Antiseptics in the way of just cleaning around it. That would be the extent of it. * * * When I first saw Mr. Gifford on December 2nd he was most certainly toxic. However, the toxemia was not one that would make you think of chronic nephritis. It was a toxemia accompanied by fever and chilling and he had this local infection. There was plenty to account for his toxemia there. I examined him every day in the hospital. I am sure the right leg was swollen and I don't believe I can remember to what extent the left one may have been. The hospital nurse placed a cotton pad under the patient's left heel, and applied ointment on the lower back, just as good nursing care, and not on orders from me. Boric powder and alcohol were applied to lesion on right heel. These dressings were by the hospital nurses and not by my orders. They were done only as proper nursing care. When I first saw the patient both extremities were not in bad shape. I do not remember when the swelling appeared in the left leg. There was progressive generalized swelling finally over the extremities and the entire body. Exhibit Q is a laboratory sheet showing a blood culture on the patient, which I ordered on December 4th, and did not receive until December 8th, the day following his death. The blood culture showed staphylococci in the blood stream, a type of infection. I do not recall that I started to make

out a death certificate showing diabetes as the cause of death before I got that blood culture report. I do not think that the cause of death was diabetes, but considered it a strong contributing factor."

On redirect examination the witness testified that he called the employer at Cedar Rapids three times by telephone after December 2. The first two times to report the patient's condition, and the last time to report his death. No other physician conferred with him at the request of the employer during the time of his treatment and care of the patient.

In addition to the other hospital records, introduced by defendants, or used by them in cross-examination of Dr. Brown, plaintiff introduced Exhibits 12 and 13. Defendants objected to Exhibit 12 as containing hearsay and opinion statements and not having proper foundation. The commissioner admitted it. This exhibit gave the admission of the patient to the hospital on December 2, 1947, his death on December 7, 1947, and "Diagnosis—Septicemia, secondary to burn infection; complicated by diabetes." The foregoing is evidence introduced in claimant's main case.

Defendants offered the testimony of three doctors, with some documentary evidence already referred to. The first two, Dr. David Beardsley and Dr. E. H. Files, never saw the employee, but testified from long involved hypothetical questions containing much of the report of Dr. Gordon, and the autopsy report of Dr. Birge, the pathologist, who also was a witness for the defendants. There was no assumption of a burn in the question.

Dr. Beardsley was an experienced physician and surgeon for many years, a graduate in medicine from the University of Michigan, with subsequent internship, and a member of State and American Medical Associations. When he testified, he was the medical director for the Iowa Mutual Liability Insurance Company, one of the defendants in the proceeding on appeal, its chief advisor, and had been for ten or twelve years, *and a member of its board of directors.*

We will not attempt to summarize the hypothetical question propounded to him. He testified that he had not prepared it

166

but had read it before it was propounded to him as a witness. His answer to the question was:

"There is not a question but what the man died according to the autopsy as the result of an endocarditis, and by practical name it was the result of some type of infection from some place. An endocarditis is an inflammation of a valve of the heart, and it excretes bacteria throughout the system. In other words, his death resulted from septicemia, an infection of the blood stream."

Asked for his opinion as to the probable source or port of entry of the infection in the blood stream, he answered:

"Of course, just assuming this, this man came in. He had a blister on his toe, which I don't know how it began. The fact he had a diabetic condition, swelled legs, standing all of the time, they could blister. Assuming that didn't amount to anything, that the nurse could tell from the facts that we have, and then he came in with an *acutely* sore throat and a temperature of 102. My assumption would be it came from the throat. Those matters usually come from a type of infection from the throat or tonsils, endocarditis." (Italics ours.)

The kernel of the answer is contained in the sentence: "My assumption would be it came from the throat." This opinion follows from some preceding statements, which are inconclusive and lacking in coherency. Also the assumption of an *"acutely* sore throat" has no support in the record. In the entry of Friday, the 28th, by the first-aid nurse in her notebook, the only statement about the throat is: "throat swabbed 1/c glycerine merthiolate." Exhibit 5 is the employer's "Individual Accident Report", which has no date and is not an original entry, and from the notation therein that Mr. Gifford was a patient of Dr. Brown in Decatur County Hospital must have been made not earlier than December 2, 1947. This report states: "Complains of sore throat, Throat Red, Swabbed 1/c glycerine merthiolate." In claimant's Exhibit 2, a blank-form report of the injury, which the employer filed with the industrial commissioner and which was signed by the first-aid nurse on December 4, 1947, is the statement, "Reported Friday Nov. 28 that had sore throat." These entries are the only evidence in the record of the employee's

having a sore throat. Dr. Brown testified he found no evidence of sore throat. This fact was not assumed in the hypothetical question. The autopsy report says nothing about evidence of sore throat.

In further direct questioning Dr. Beardsley testified that the toes of diabetics often become gangrenous both with and without injury. Asked how he ruled out the right little toe as the source of infection in the blood stream, the doctor answered: "Well, from the evidence that—from the statement the nurse said there was just a blister there, and the poor circulation he would be much more likely, and the *acuteness of it*, the fact that it came on after he developed sore throat, is my assumption." (Italics ours.)

In spite of the fact that an autopsy, as stated in the report, disclosed a "crusted ulcer of right fifth toe" and "the lateral aspect of the proximal part of the right fifth toe is covered by a thick black eschar which extends on to the adjacent lateral surface of the foot and which has a maximum diameter of 3 cm., and when the eschar is removed necrotic subcutaneous fat is encountered", Dr. Beardsley gave as his opinion that the little toe was not the entry portal of the infection.

What is an ulcer? It is defined as an open lesion upon the skin or mucous membrane of the body, with loss of substance accompanied by formulation of pus. What does necrotic mean? It is a condition of necrosis or of dead, gangrenous tissue. Surely the industrial commissioner had good grounds and reasons to find that this condition of the right little toe was a very probable source of infection.

What is an eschar? Medical dictionaries say it is a scab, or slough produced by a burn, or by cauterization by a caustic or corrosive substance. Here is evidence introduced by defendants that the injury to the right little toe was caused by a burn. It corroborates and sustains the evidence of claimant. There is no evidence that any caustic or corrosive treatment was ever applied to this toe. The evidence is affirmatively to the contrary.

Dr. Brown testified that the little toe showed evidence that it had been caused by a searing burn. It had a dry scab, an eschar, which was present at the time of the autopsy. He said

168

he had no occasion to drain it. He first saw it on the twelfth day after the injury. The first-aid nurse said there was no pus or drainage at any time she dressed the toe, the last time being on November 26. This might well have been. The toe may not have begun open suppuration at that time. The drainage might have ended when the doctor first saw the patient. It was the only toe which received a trauma or external injury. The first-aid nurse dressed the right foot six times and made no statement about the second toe on the right foot, or of any inflammation, infection or lesion affecting it, or pus or drainage from it. She gave no testimony to that effect. Dr. Brown testified that pus first discharged from the second toe about three days before the patient's death. The autopsy disclosed the same necrotic tissue at the under base of the second toe that it disclosed under the eschar on the side of the little toe. The evidence fairly shows that the logical and probable source and entry of the infection in the blood stream was at the initial lesion or injury to the right foot, which was its little toe, and fully warranted the commissioner in so finding.

Dr. Beardsley testified that a burn might activate an inactive diabetic condition even if the foot was not infected, particularly if it burned through the shoe and sock. He was asked on direct examination whether the infection did not ordinarily manifest itself through some break in the skin or port of entry. His answer was: *"I don't know the answer. They sometimes show and sometimes do not, the infection. That is the answer. I don't know."* (Italics ours.)

Dr. Files, whose practice was largely for some of the bigger industrial companies, naming several, in answer to the same or substantially the same hypothetical question, answered: "From the necropsy report (the autopsy) the findings were such as to indicate the direct cause of death as being generalized septicemia with acute bacterial ulcerated lesion on one of the valves of the heart; with still a dry lesion over the right little toe without pus, and with further findings of pus in the sole of the right foot draining through a sinus on the right second toe * * * subsequent to the inciting infection in the throat * * *." (He said he was not a pathologist, as did Dr. Beardsley.)

Dr. Birge said he found an area of slight thickening and

slight roughening on one of the seven leaflets of the tricuspid valve of the heart. The thick black eschar on the right little toe had a red-black appearing hard crust and went more deeply than an ordinary scab. He said there were many possible sources of infection and bacteria in the blood stream. He gave his opinion that the infection started in the region of the base of the second toe because he found obvious pus and destruction of tissue there. While he testified that he found no connection between the pus in the sole of the foot and the little toe, there were indications of damage of the tissue there, not necessarily infected. He could find no gross or frank evidence of infection there. But in answer to the question: "Where was most of the indications of infection in that foot, doctor?", he answered: *"In the region of the base of the little toe and back of that.* Q. And extended backward? A. And extended back of that region. Q. But in general, ordinarily would you expect to find that? A. Yes. Q. The base of what toe, doctor? A. In the region of the base of the second toe. Q. Now, if the source or portal of entry for infection into the blood stream had been the little toe would you ordinarily expect to have found indications of infection at the portal of entry? A. I think that we ordinarily do find such evidence and yet there are many times when it is impossible to find, on the other hand, the portal of entry." (Italics ours.)

On cross-examination he testified:

"In my opinion the portal of entry of this infection was the right foot, region of suppuration infection *and I am reasonably certain that the portal of entry was not through an infection of the throat. I am by no means certain.* * * * Q. Was the cause of death of this man, regardless of the portal of entry, general infection? A. Yes. * * * Q. And your opinion and best guess is that it came from the right foot? A. Yes. To be more specific, the tissues in the region of the base of the second toe of the right foot. Q. But did you find dead tissue below this black scab of the fifth little toe of the right foot? A. Yes, sir. Q. Doctor, you are not saying here as an expert that the facial spaces around the tendons or the bones of the toes of the right foot, that it would not be possible for infection to get from the fifth toe to the second toe, are you? A. I wouldn't say—no. Q. Doctor,

is it possible for a burn or trauma to arouse a latent diabetic condition? A. Yes. Q. Very probable, isn't it? A. Yes."

I. This is a law action and we are not trying the case de novo in this court. We are simply determining whether there is evidence sufficient in quality and quantity to sustain the findings and the award of the industrial commissioner, and to warrant it, upon the review by him. We have set out the evidence quite fully and, we believe, fairly. It would be a work of supererogation to discuss all of the material, competent and relevant items of evidence or to review the many decisions of this court bearing upon the questions involved. The lawyers of the state are familiar with them. The pertinent statutes are particularly important.

Section 86.18 of the 1946 and 1950 Codes of Iowa is as follows: "Liberal rules of evidence. While sitting as a board of arbitration, or when conducting a hearing on review, or in making any investigation or inquiry, neither the board of arbitration nor the commissioner or his deputies shall be bound by common law or statutory rules of evidence or by technical or formal rules of procedure; but they shall hold such arbitrations, or conduct such hearings and make such investigations and inquiries in such manner as is best suited to ascertain and conserve the substantial rights of all parties thereto. Process and procedure under this chapter shall be as summary as reasonably may be."

Section 86.29 of the 1946 and 1950 Codes of Iowa is as follows: "Record on appeal—findings of fact conclusive. The transcript as certified and filed by the industrial commissioner shall be the record on which the appeal shall be heard, and no additional evidence shall be heard. In the absence of fraud the findings of fact made by the industrial commissioner within his powers shall be conclusive."

II. We think the record shows beyond fair dispute that the right shoe of the employee was burned at the place where his right little toe was when the shoe was on his foot, and that that toe was burned at the same time. The witness Bonebrake saw the right shoe discolored as though burned about six or seven o'clock in the afternoon of November 21, 1947. Both he and Mr.

Gifford were working on the eight-hour shift beginning at 3:30 p.m. Mrs. Solbrig, Mrs. Gifford and her two sons each saw the brown-colored right shoe, and, after describing the appearance of the hole in the shoe, each gave an opinion that the hole was made by heat or burning. Each was competent to express such opinion. That the little toe was injured appears without question from the testimony of Mrs. Solbrig and Mrs. Gifford. The first-aid nurse dressed the injured toe six times, but she conjectured that the injury was caused by a thread in his sock rather than by a burn. Dr. Brown testified that the injury to the little toe appeared to him to have been caused by a searing burn. Dr. Brown and Dr. Birge saw the thick, black encrusted eschar on the little toe. An eschar is the term the medical profession use to describe an injury caused by a burn. The bed sheets between which Mr. Gifford slept were soiled at the lower end of the bed by the discharge from the injured toe commencing about the last week in November 1947.

III. In what manner did the burn occur? He had been employed by the defendant-employer November 7, 1947, and worked each of the five workdays a week up to and including November 26. He did electric welding, which required the handling of hot pieces of metal. He was out of sight of others on three sides of his booth and he worked alone. His impaired lack of feeling in his feet and toes prevented him from readily detecting his contact with the heated metal until the burn became an aggravated one. If he made an outcry or exclamation on feeling the burn, it was not heard or it might well have been drowned out with other loud noises. Bonebrake came into Mr. Gifford's booth a short time before lunch time, and he told Bonebrake he had put welded metal on the floor and proceeded to work on another welding job and then inadvertently contacted the still hot metal on the floor with the right side of his right shoe and foot. Everyone knows the excruciating pain of even a slight burn and that it continues for a long time. His was a deep and serious burn and even with his impaired sensitiveness to injury in his feet and toes the pain probably continued for a substantially longer time. It was on his mind and he told the circumstances to Mr. Bonebrake at once. He showed him the burned shoe and the hot metal lying at his feet on the floor.

172

Bonebrake observed both. The metal was a flat piece with many angles, which might make the kind of a hole that was made. It was not a narration long after the occurrence, but the burned shoe and the welded metal were there on the floor confirming what Mr. Gifford was telling him. The shoe and the metal were in fact speaking for themselves. What Mr. Gifford told his coemployee was peculiarly and definitely a part of res gestae. However, without this conversation it is our conclusion that the injury was an employment injury effected in the performance of his work, and by and in the course of his duties as an employee of the Iowa Manufacturing Company. Here, certainly, as we said by quotation in DeLong v. Iowa State Highway Comm., 229 Iowa 700, 711 et seq., 295 N.W. 91, 97, there was, in addition to the testimony of the witness Bonebrake and any hearsay testimony, "a residuum of legal evidence to support the claim", and the award of the commissioner. Defendants put in much hearsay evidence, in the cross-examination of the nurse and other witnesses of the claimant to establish their case, which tended to establish the employment character of the injury and that the injury to the little toe was the source of the infection, for them to insist upon a technical and strict application of the hearsay rule and formal rules of evidence. See also Sinclair v. McDonald, 229 Iowa 1234, 1235, 296 N.W. 362.

IV. Did the employee's death result from and was it directly and proximately caused by the injury? We think this was amply shown and by the great preponderance of the evidence. Defendants tried their case on the theory that the source and portal of entry of the infection was the employee's sore throat. The greater weight of the evidence is against the fact of any sore throat, and their experts disagree that any sore throat was the source or entry place of the infection. Drs. Beardsley and Files said it was, and Dr. Birge said in his best judgment that it was not. The latter performed the autopsy. He examined the tissues and organs of the corpse. He was in the better position to pass upon the matter. His opinion rather neutralized, if it did not substantially destroy, the opinions of his professional co-witnesses. Dr. Birge was of the opinion that the fluctuant pus in the right sole back from the second toe was the more probable source. Fluctuant means there was a wavering

mass of pus in the sole of that foot back of both the second and the fifth toes, with most of the indications of infection in the foot "in the region of the base and extended back of the little toe." Each of these three doctors said that any lesion or injury might activate and aggravate the latent diabetes, which would include the first lesion which was in the little toe. Dr. Birge would not say that the infection would not pass from the little toe to the area back of the second toe. He could hardly say otherwise, for once the blood stream is infected at any source the circulation of it would carry to every organ and bone and flesh tissue of the body. His own reported autopsy showed necrotic, or dead and gangrenous, tissue in both the second and fifth toes and adjacent areas. All the doctors agree that septicemia was the basic cause of death.

Dr. Brown was in the best position of any and all of the other doctors. He treated Mr. Gifford during the last eight days of his life. He saw him and attended him professionally several times each day. He was an observer at the autopsy. It was his diagnosis that death was caused by septicemia from the infected burn, secondary to diabetes. The commissioner by his award found, and under the record was justified in doing so, that Dr. Brown's opinion was most worthy evidence.

Something was said about pads of cotton under the left heel and sacral area. Dr. Birge in his autopsy report referred to the "decubitus" in these areas. That is a doctor's designation of the well-known bedsores.

The late E. P. Corwin, as industrial commissioner, made an order on July 13, 1949, awarding the claimant compensation for 300 weeks at $20 a week together with interest at six per cent on accrued payments from and after November 21, 1947, with specified additional payments for burial, surgical and hospital services and payment for the Secondary Injury Fund.

It is our conclusion that his findings and award are sufficiently established by competent evidence of the required quality and quantity. Under Code section 86.29, hereinbefore cited, his findings of fact within his powers in the absence of fraud shall be conclusive. There is no fraud and he did not exceed his powers. Interference by the district court or this court would be encroaching upon the province and jurisdiction of the com-

174

missioner. For other decisions in support of our conclusion, see Page v. City of Osceola, 232 Iowa 1126, 5 N.W.2d 593; Smith v. Soldiers & Sailors Memorial Hospital, 210 Iowa 691, 231 N.W. 490; Lindahl v. Boggs Co., 236 Iowa 296, 18 N.W.2d 607; Aldine Trust Co. v. National Benefit Assn., 222 Iowa 20, 268 N.W. 507.

Defendants have asked us in case of reversal to send the case back to the industrial commissioner for redetermination. We see no good reason to do so. It is now over four years since the injury. There is no showing or indication that new evidence could be found. It is not in the interest of justice to do so, and the request is denied.

The judgment of the district court is reversed and the cause is remanded with direction to the district court to remand the case to the industrial commissioner with instructions to reinstate in full the said award made by Industrial Commissioner E. P. Corwin; and that all costs be taxed to the defendants.—Reversed and remanded.

OLIVER, WENNERSTRUM, GARFIELD, HAYS, MANTZ, and MULRONEY, JJ., concur.

THOMPSON, C. J., takes no part.

SMITH, J., not sitting.