**Robert A. HOLMES, Appellee,**

v.

**BRUCE MOTOR FREIGHT, INC. and American Mutual Liability Insurance Company, Appellants.**

**No. 56158.**

Supreme Court of Iowa.

Feb. 20, 1974.

Hopkins, Bump & Huebner, Des Moines, for appellants.

Henry J. Haugan, Des Moines, for appellee.

Heard before MOORE, C. J., and MASON, LeGRAND, REES and UHLENHOPP, JJ.

UHLENHOPP, Justice.

The question in this workmen's compensation appeal is whether claimant established as a matter of law that a heart attack (myocardial infarct) arose out of and in the course of his employment. See Code 1973, § 85.3(1). A heart attack, if attributable to the employment, is a compensable "injury," although the claimant already had latent heart disease. Littell v. Lagomarcino Grupe Co., 235 Iowa 523, 17 N.W.2d 120. The claimant has the burden of proving by a preponderance of the evidence that some employment incident or activity brought about the health impairment on which he bases his claim. Lindahl v. L. O. Boggs Co., 236 Iowa 296, 18 N.W.2d 607; Bodish v. Fischer, Inc., 257 Iowa 516, 133 N.W.2d 867. A possibility is insufficient; a probability is necessary. Burt v. John Deere Waterloo Tractor Works, 247 Iowa 691, 73 N.W.2d 732. The incident or activity need not be the sole proximate cause, if the injury is directly traceable to it. Langford v. Kellar Excavating & Grading, Inc., 191 N.W.2d 667 (Iowa). Judicial review of a decision of the Iowa Industrial Commissioner is not de

novo, and the commissioner's findings have the force of a jury verdict. Paveglio v. Firestone Tire & Rubber Co., 167 N.W.2d 636 (Iowa). The commissioner, not the court, weighs the evidence, and the court broadly and liberally construes the commissioner's findings to uphold rather than defeat his decision. Musselman v. Central Tel. Co., 261 Iowa 352, 154 N.W.2d 128. The question is not whether the evidence is sufficient to support a finding the commissioner did not make but whether the evidence supports the finding he did make. DeShaw v. Energy Manufacturing Co., 192 N.W.2d 777 (Iowa).

A hearing was held before the Deputy Iowa Industrial Commissioner on the present claim and a hearing on review was held before the Iowa Industrial Commissioner himself. The hearings were of some length and we cannot restate all the evidence. We will set out sufficient to show the problem involved.

Claimant Robert A. Holmes, then 41, worked for Bruce Motor Freight, Inc. for three years making local deliveries. Subsequent examinations showed that during the period in question he had several problems unrelated to his heart—a duodenal ulcer, a hiatal hernia, a nonfunctional gall bladder, a diverticulum coming off the duodenal loop, and emphysema. At some point he also had pneumonia and a possible pulmonary embolus (an abnormal particle in the lung). Also at some time and from some cause—and this is the dispute in the case—he sustained a myocardial infarct (localized death of heart muscle resulting from obstruction of circulation by blood clot or abnormal particle). The myocardial infarct rendered him wholly and permanently disabled and constitutes the foundation of the claim.

Claimant predicates his claim on an incident that occurred on Thursday, April 6, 1967, which he asserts caused his heart attack. At that time he was helping to move heavy barrels. While tipping a barrel, he lost control of it and it pinned him near the stomach or waistline against other barrels. He pushed the barrel aside and let it go to the floor. Later, other barrels were also dropped.

Claimant's testimony at the hearings was not altogether consistent with statements he made after the incident. He testified that he did not experience pain when the barrel pinned him, and he and his fellow employee then moved other barrels. But he soon experienced difficulty breathing and went out on the dock to get fresh air and have a cigarette. He returned and helped move additional barrels. He testified he then had some stomach and chest pain. He helped load another trailer with cartons and testified he noticed some pain in his stomach and chest. He also stated however that he "did such loading for an hour and a half or two hours and did not experience any further pain or discomfort other than in his stomach." He then went to eat but the food did not taste good. He noticed no pain when he went back to work from lunch nor during that night. He returned to work on Friday, April 7. That day he helped load laundry carts and truck tires but did not eat breakfast or lunch. He testified he did not feel any pain in his shoulders but had an upset stomach and pain around the waist.

Claimant further testified that on Saturday morning, April 8, his "back and shoulders were killing him." He tried a hot bath and liniment, without relief. He called Bruce's terminal manager who referred him to Robert J. Foley, a medical doctor. Dr. Foley had treated a great many heart conditions. The information which claimant related to Dr. Foley does not altogether square with claimant's subsequent testimony about some of his symptoms following the April 6 incident. Dr. Foley testified:

Q. Doctor, do you recall the complaints that were first made when Mr. Holmes presented himself to you? A. Mr. Holmes came in complaining of pain in the upper back, low cervical area, with some radiation on the back side to the left, but it was all on the posterior surface of the chest.

Q. Did you also make an examination of him at that time? A. Yes.

Q. And what did your examination reveal, Doctor? A. Mainly that he had a spasm in the paraspinous muscles and the area where he complained of pain. I didn't see any bruising, anything like that, on the skin. He had—this pain that he complained of was aggravated some by motion, and I don't mean by that exertion, but motion of the affected area when he would twist himself or turn it seemed to aggravate this pain.

By feeling the area where claimant complained of pain, Dr. Foley found that claimant had a muscle spasm in the cervical and thoracic area of the back. He stated, "The muscles were tight and hard, more so than you would expect in the ordinary relaxed situation."

Dr. Foley further testified:

Q. Was there any complaint about chest pain, doctor? A. No complaint of chest pain then.

Q. How about a complaint of a pain in the left arm or of the immediate area? A. No.

This testimony is consistent with claimant's statements on cross-examination that he did not tell Dr. Foley about shortness of breath or chest pain.

Dr. Foley testified in addition:

Q. Did you make a diagnosis at that time, Doctor? A. Yes. I X–rayed the areas that were—that could be involved with this and the X-rays were normal and my conclusion then was that this was an acute myofascial strain.

Also:

Q. Did you diagnose at that time a myocardial infarction or a heart contusion? A. No, I did not.

Q. Were there any symptoms related to you to lead you to believe that the patient might have been suffering from either a myocardial infarction or a my-

ocardial contusion at that time? A. None at all.

Dr. Foley prescribed a muscle relaxant and an analgesic.

Claimant worked on Monday, April 11. The medication upset his stomach so he returned to Dr. Foley on April 14. At that time he still complained of back pain but at this time it was lower, in the lumbar area. Dr. Foley examined him again but found no reason to change the diagnosis. Claimant did not complain about chest or arm pain. After explaining in his testimony the symptoms of myocardial contusion and myocardial infarction, Dr. Foley testified:

Q. Doctor, did Mr. Robert A. Holmes have either the symptoms you have related to the myocardial contusion or the myocardial infarction when you had occasion to treat him on April 8th, 1967, or on April 14th, 1967? A. No.

Q. And by no you mean he had none of the symptoms? A. The symptoms that the patient related to me were in no way suggestive of heart pain or heart damage at all.

Also:

Q. There was nothing to suggest in either of the two separate occasions when you examined Mr. Holmes, either by his own complaint or by your physical examination, to suggest that he had a myocardial infarction, is that correct? A. No, there was nothing.

Claimant worked the rest of that week. He did not lose any time at Bruce's from April 6 to 17 except while with the physician. He testified, though, that during the rest of the week of April 11 he felt run down, but that "[h]is stomach was the main reason for everything. He just seemed to have lost his appetite. Otherwise during that week he did not experience any pain but just felt run down because he was not eating." He asked the terminal manager for permission to see another doctor, and an appointment was

made. But before that time arrived, other events occurred.

Claimant returned to work on Monday, April 17, and worked that day. He testified his stomach, back, and arms pained. That evening he contacted Dr. E. K. Wirtz and entered a hospital where he remained until May 10.

The statements which Dr. Wirtz testified claimant made to him were considerably different from those claimant admittedly made to Dr. Foley. Dr. Wirtz testified claimant stated that after the barrel incident he had severe pain in his chest and down his arms and he would break out in a cold sweat and become weak. Dr. Wirtz examined him and took X-rays and obtained electrocardiograms. He discovered the ulcer, hernia, nonfunctional gall bladder, and diverticulum. He also found lung involvement which could be pneumonia clearing up or a blood clot absorbing. As to the heart, he testified the first EKG, on April 22, was abnormal, suggesting a posterior myocardial infarction or a possible abnormal particle in the lung; the next EKG, on April 23, was suggestive but not diagnostic; the next, on April 26, was a borderline tracing with no gross change from the previous one, suggestive but not diagnostic of early infarction; and the next, on May 1, showed "no gross changes compatible with posterior infarction" and, according to the report, was "probably normal for this individual." Dr. Wirtz also ran an enzyme test which he testified indicated a heart muscle had been embarrassed by lack of blood but not destroyed.

After claimant was discharged from the hospital on May 10, he developed abdominal pain and was readmitted on June 1. He had surgery for his gall bladder and was discharged on June 11.

On July 11, 1967, a medical report, purportedly signed by Dr. Wirtz, came from his office, giving as his diagnosis in connection with the first hospitalization, "Myofascial strain cervical and dorsal spine," and for prognonsis, "Good." Dr. Wirtz subsequently testified that he did not prepare or sign the report, that his girl affixed his signature stamp after preparing the report. His denial, however, is not altogether consistent with his admitted prescribing of medication for a myofascial strain after the first hospital admission— although he testified in addition that he also prescribed heart medicine.

On September 27 claimant was readmitted to the hospital for a respiratory infection and bronchitis. He was discharged on October 4.

Dr. Wirtz testified that on November 4 the first positive report of myocardial infarction was made, that the prior reports were suggestive.

On April 9, 1968, Dr. Wirtz entered claimant in the hospital to check his heart. At that time Dr. James W. Chambers interpreted the EKG. He reported to Dr. Wirtz that "this equivocal tracing showing [shows?] low voltage in many leads together with some evidence of posterior myocardial infarction. However the character of the ST elevation is typical. This probably indicates old posterior myocardial infarction."

In June 1968 claimant was again hospitalized, this time for shortness of breath. He testified he quit smoking for a time.

Claimant never returned to work for Bruce and has done only light work. Dr. Wirtz' ultimate diagnosis of claimant's original condition was a duodenal ulcer, hiatal hernia, arteriosclerotic heart disease with coronary sclerosis, possible pulmonary embolism, resolving pneumonia, and nonfunctioning gall bladder.

To establish his claim, claimant had to tie together the barrel incident, on which he predicated the claim, and the infarct. No one contends the myofascial strain caused disability. Dr. Wirtz testified his original impression was that claimant had a myofascial strain, but looking back on the case, he knew that claimant sustained a myocardial infarct at some time and, from

the history claimant gave him, he knew claimant had no trouble before the barrel incident and had pain thereafter. He therefore associated the infarct and the barrel incident and opined that the latter caused the former. He summarized his views in this testimony:

I feel this way. That this man suffered this injury in this so-called barrel incident on the 6th of April. He began having pain at that time. His pain didn't improve with treatment. Any attempt to work and attempt to try to go back to his job caused the pain to be more severe over a period of six or eight months. The EKG shows a change going on until, finally, the electrocardiogram taken in June of '68 showed the old infarct of the posterior wall of the heart. Enzyme studies at this time period, this showed a decrease in the SGOT at this time so I feel that something did go on during this period of time that he was certainly free [of] before this 6th of April injury.

Also:

I'm saying that something occurred to this man in April or on the 6th of April when he described this incident that caused a change to take place in his heart which ends up with the diagnosis I gave you on this electrocardiogram. The ones prior to that the cardiologist would ask for repeats or serial EKG's. The enzyme showed a decrease so something was going on in his heart which had probably contributed to that pain that he had. That's why he didn't respond to the treatment that he had before I saw him.

Dr. Wirtz testified that claimant is totally and permanently disabled as a result of the myocardial infarct.

After the first hearing, the deputy commissioner found as a fact that claimant failed to prove necessary causal connection. He therefore denied the claim.

Claimant appealed to the commissioner. After the second hearing, which included more evidence, the commissioner made the same fact-finding and affirmed the deputy's decision.

Claimant then appealed to district court, which reviewed the proofs, found that the evidence established the claim, reversed the commissioner's decision, and ordered the commissioner to allow the claim. The court held that the commissioner misinterpreted the evidence. Bruce and its insurance carrier appealed to this court.

■ The question before us is whether claimant proved as a matter of law that the barrel incident caused the infarct and resulting disability or whether the issue was one of fact. That claimant sustained an infarct at some time is clear. But what caused it and when did it occur? Were compensation appeals heard de novo by the judiciary, we might arrive at the result the district court reached. But compensation appeals are not so heard. Whether a particular decision of the commissioner be for the claimant or for the employer, the judicial scope of review is to ascertain whether there is "sufficient competent evidence in the record to warrant the making of the order or decision." Code 1973, § 86.30(4). Under this statute, we regard the commissioner's fact-findings as tantamount to jury findings; if a jury issue is presented, were the case tried to a jury, the commissioner's findings stand. Langford v. Kellar Excavating & Grading, Inc., 191 N.W. 2d 667, 668 (Iowa) ("We have variously expressed this rule by saying his findings are binding upon us if supported by substantial evidence; the facts determined by the industrial commissioner have the same effect as a jury verdict; and we may not interfere with such findings where there is a conflict in the evidence or when reasonable minds may disagree as to the inferences to be drawn from the evidence, whether disputed or not."); Poole v. Hallett Constr. Co., 261 Iowa 481, 154 N.W.2d 716.

Were this a jury case, a trial court would be required to submit to the jury the question of the causal connection between the April 6 incident and the infarct. On this evidence, a court could not direct a jury to find for the claimant on that issue. Hence the issue was for the commissioner. The commissioner did not misinterpret the evidence. He simply weighed it and found that claimant had not tipped the scales.

We hold that a fact issue was presented and that the commissioner's decision must stand.

Reversed.