# IN THE COURT OF APPEALS OF IOWA

No. 14-0164
Filed March 11, 2015

**DOUGLAS MOAD, By his Wife SHARON MOAD,**
**Petitioner-Appellant,**

**v.**

**GARY JENSEN TRUCKING, INC., Employer, and**
**DAKOTA TRUCK UNDERWRITERS, et al.,**
**Respondents-Appellees.**

_____

Appeal from the Iowa District Court for Polk County, Donna L Paulsen,

Judge.


A widow appeals the district court's decision that affirmed the workers'

compensation decision denying death benefits.  **AFFIRMED.**


Martin Diaz and Elizabeth Craig of Martin Diaz Law Firm, Iowa City, for

appellant.

Sasha L. Monthei, Cedar Rapids, for appellee.


Heard by Vogel, P.J., McDonald, J., and Scott, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2015).

**SCOTT, S.J.**

This case concerns the tragic death of Douglas Moad, who died approximately three months after he was severely injured in a collision while driving a trailer-truck for his employer, Gary Jensen Trucking, Inc. Douglas's widow Sharon sought workers' compensation benefits on his behalf, which were denied after the Iowa Workers' Compensation Commissioner found she had not met her burden of establishing that Douglas's death "was the sequel or result of a work injury" and that she was entitled to benefits following Douglas's death. Sharon sought judicial review of the decision by the district court, and the court affirmed the decision, though it expressed its disagreement with the agency's decision.

Sharon now appeals the district court's ruling affirming the agency's decision. Because we conclude substantial evidence supports the agency's causation determination, we affirm the district court's judicial review ruling.

### I. Background Facts and Proceedings.

The facts surrounding Douglas's injury and death are largely undisputed. Douglas worked as a truck driver for Gary Jensen Trucking, Inc. On December 1, 2008, Douglas was driving his truck within the course of his employment on Interstate 80 near Iowa City when an SUV driver drove his SUV across the median and struck Douglas's truck head-on. The other driver died at the scene. Douglas died roughly three months later.

At the time of the accident, Douglas was 64. He weighed approximately 171 pounds, and he was a 100-packs-a-year smoker. His health history included severe chronic obstructive pulmonary disease (COPD); emphysema; shortness

of breath, which was controlled with use of an inhaler; high cholesterol, reported to be at an elevated LDL level of 133 in 2007; high blood pressure, which was controlled by medication; and he was a survivor of prostate cancer.  Beyond high blood pressure, Douglas had no prior history of heart problems, nor had he ever been told he had heart disease.

At the scene of the accident on December 1, Douglas was pulled from the wreckage by a passerby as his truck was engulfed in flames.  He was taken by ambulance to the University of Iowa Hospitals and Clinics, and it was determined he had five broken ribs and a flail chest, collapsed lungs, a grade II splenic laceration, COPD exacerbation, a left eyebrow laceration, and a small subdural hematoma.  Douglas was intubated and extubated, and his treatment required the placement of four chest tubes in his chest, two on each side.  He spent eleven days in the hospital and was discharged with continuous oxygen supplementation and scheduled nebulizer treatments.  He was advised he "should avoid any sort of strenuous activity for six weeks" and follow-up with his primary care physician.

After discharge, Douglas complained of constant pain, swollen legs, and poor appetite.  Against advice, he continued smoking.  He was unable to move around very much without pain.  He saw a physician about a week later, and the doctor noted Douglas still complained "of a fair amount of pain."  Douglas's blood pressure was noted to be "fairly low," and his "[h]eart was regular without murmur" and without abnormal heartbeats, and its rate was not faster than normal.  The doctor also reported Douglas had "pain when he trie[d] to take a deep breath and still move[d] slowly using a walker."

On December 30, 2008, Douglas had an appointment with a pulmonologist, and there he complained of chest pain; swollen, fluid-filled legs (edema); and poor appetite. He was then admitted to the hospital, and he complained of "left chest pain" and shortness of breath, and he stated he could not "walk because of the severity of the pain." The hospital report noted Douglas did "not have a history of coronary artery disease. He has had chest pain, however, but this has been since the area of trauma." Douglas was discharged about a week later, after his pain was well controlled, his respiratory function was significantly improved, and his leg edema was significantly reduced. Scans at that time showed no pulmonary embolus.

Douglas followed-up with his physician on January 12, 2009. At that time, Douglas reported that his "left [chest] pain [was] now 5/10 and occasionally [went] as high as 10/10 without pain meds, but the [pain meds were] helping. It increase[d] when he breathe[d] and decrease[d] when he lay[] still. He rate[d] the pain as sharp, continuous . . . [and had o]ccasional left arm numbness."

Douglas saw his doctor again on January 23, 2009. He reported he did

> not do too badly while he [was] at rehab, but a little while after
> finishing rehab, he [got] severe pain in the left side of his back. He
> complain[ed] that he [was] still very tender on that side. He also
> [was] finding that he [got] very short of breath. [H]e said he [woke]
> in the morning, and sometimes he is so panicky and short of breath
> that he even has a difficult time doing his [nebulizer].

He also "complained of severe substernal burning discomfort following exercising."

Douglas followed-up with his pulmonologist at the end of January 2009. He told his doctor that he had been in more pain for the last twenty days. He

reported he had "difficulty breathing for around an hour or so, after which he [was] able to take his . . . nebulizer." The doctor noted in his physical examination of Douglas that there was "exquisite tenderness over the left-sided chest wall." He referred Douglas to a physical medicine and rehabilitation specialist for his continued pain and recommended Douglas consider localized therapy.

Douglas saw the rehabilitation specialist February 18, 2009, four days before his death. Douglas's chief complaint at that time was "[l]eft-sided chest pain and left arm numbness." That doctor noted Douglas continued

> to have difficulties with sleep and some weight loss. He continue[d] to have poor appetite, hypertension, and some leg edema, which [was] improved. He ha[d] numbness within his left arm, shaking and occasional tremor, weakness of his left hand, some anxiety and depression, frequent urination, occasional nausea and some shortness of breath.

The specialist recommended changing certain medications and following-up in a few weeks.

On February 21, 2009, Douglas and Sharon went to a friend's funeral, requiring Douglas to leave the house, something he only did to go to his doctors' appointments. Douglas was able to walk, and "he looked the picture of health" and "ten years younger," according to Sharon. The next morning, Douglas woke his wife up around 4:00 a.m. complaining of arm pain. A pain pill and a pain patch did not alleviate his pain, and Douglas did not think he could walk to have Sharon take him to the hospital. An ambulance was called, and Douglas was taken to the emergency room.

The emergency-room report stated:

> [Douglas complained] of upper extremity pain. Upon arrival in the emergency room, [Douglas] was noted to have [an] irregular heart rate. . . . [His b]lood pressure also dropped . . . [and he developed] chest pain. He was given . . . aspirin. Douglas has a significant history for a motor vehicle crash in December of last year. He had bilateral [collapsed lungs] as well as rib fractures. Since that time Douglas states he has had upper extremity pain. The onset of shortness of breath was sudden this morning.

Thereafter, Douglas's condition deteriorated; his blood pressure dropped and he continued to have chest pain "with radiation to his bilateral upper extremities." An electrocardiogram showed "atrial fibrillation, possible myocardial infarction but no obvious ST elevation." It was recommended Douglas be transported to the Avera Heart Hospital via helicopter, and he was intubated to facilitate transport. His blood pressure and rate stabilized then fell several times, but he improved after he was given epinephrine. The report noted that a chest x-ray showed no obvious findings as compared to the past, and it was assessed that Douglas had suffered either a myocardial infarction or pulmonary embolism. The emergency room physician noted it was her impression that Douglas suffered a "cardiac event."

Douglas was airlifted to the hospital, and during the flight, he coded intermittently, requiring CPR be performed. CPR continued upon arrival at the hospital, but Douglas was never revived. He was later pronounced dead. The treating cardiologist, Dr. Watt, diagnosed Douglas at the time of his death with

> 1. Pulseless electrical activity, quite possibly secondary to either a massive pulmonary embolus or a massive myocardial infarction.
> 2. History of motor vehicle accident and trauma with prior rib fractures and respiratory insufficiency.

No autopsy was performed. The death certificate indicated Douglas died of "ventricular stand still probable massive pulmonary embolus" and stated the manner of his death was natural causes.

Thereafter, Douglas's wife Sharon filed a claim for workers' compensation death benefits on Douglas's behalf, asserting the injuries from his December accident was the cause of his eventual death. Douglas's employer admitted Douglas suffered injuries in his accident, but it denied that those injuries caused or contributed to Douglas's death. A hearing was held before a deputy workers' compensation commissioner in September 2012. Both Sharon and the employer offered expert opinions on the cause of Douglas's death.

Bruce, the cardiologist who treated Douglas the day of his demise, was deposed and testified it was his opinion that Douglas's probable cause of death was a massive pulmonary embolus, though it was also possible he died from a massive myocardial infarction. Dr. Watt explained that pulmonary emboli were one of the major complications for persons who were at bed rest for a few months who suddenly became active, and he testified that the consequences from Douglas's accident, being "sick for so long and debilitated and immobile to some extent, . . . directly relate[d] to the type of setting that could lead one to . . . the tendency to have a pulmonary embolus or that type of diagnosis, prolonged debility." Dr. Watt also opined that if Douglas died from a heart attack, it was possible it was stress-induced from his accident, but he testified that was generally more evident right at the time of the accident. Similarly, Dr. Watt believed it was possible that if Douglas died from a heart attack it could have been caused just by the stress of the physical ailment and debility from the

accident but testified it was "also possible he could have had pre-existing coronary artery disease and spontaneously had a plaque rupture and had a massive heart attack."

The employer's expert, Dr. Ronald Vessey, an internist, opined it was "most probable" that Douglas "died of the sudden death syndrome secondary to having developed an acute event." Dr. Vessey did not believe there was evidence that Douglas had suffered any pulmonary emboli. Dr. Vessey noted Douglas had complained "of retrosternal chest pain exacerbated by exercise, a classic history for a patient with unstable angina," and he concluded "[t]his man probably had [coronary heart disease], an ordinary disease of life, multifactorial in origin, and responsible for his demise. . . . It is my contention that it is most probable that this man died from having suffered a massive myocardial infarction." The expert further opined:

> . . . [Douglas] died secondary to progression of his non-work-related [coronary heart disease]. This man's [coronary heart disease] was not caused by his work as a truck driver. His [coronary heart disease] reflected his maleness, his advancing age, his 100-pack/year history of smoking, his hypertension and his hyperlipidemia, with an elevated LDL cholesterol. There is no evidence in this record that, in the 50-plus days from [the date of the accident] on through [January 22, 2009], reflecting the passage of seven-plus weeks, this patient had any significant cardiac-related pain process. Then, on [January 23, 2009,] and, again, on [January 26, 2009,] and, again, on [February 18, 2009], tumbled to the fact that this patient was developing angina pectoris[, i.e. exercise-related cardiac pain].

Dr. Vessey concluded it was his "impression, based upon a reasonable degree of medical certainty, that [Douglas's] sudden death syndrome reflected the fact that this patient had developed an acute coronary syndrome secondary to [Douglas's] obvious multifactorial, underlying [coronary heart disease]."

Sharon's expert, Dr. Dan Fintel, a cardiologist, essentially disagreed with Drs Watt and Vessey. Dr. Fintel agreed with Dr. Vessey that it was unlikely Douglas's death was caused by blood clots and that Douglas possessed "several cardiac risk factors which likely resulted in a component of underlying coronary artery disease (which would have existed both before and after the collision)." However, Dr. Fintel opined that it was

> likely, to a reasonable degree of medical certainty, that the emotional and physical stress related to the incident, including his painful convalescence, contributed to acceleration of his arteriosclerosis and caused the rupture of an unstable coronary plaque on or before [his death]. In addition, it is well known that blunt chest trauma associated with the sudden deceleration/acceleration of his head-on motor vehicle accident can cause traumatic injury to coronary arteries, resulting in more rapid progression of atherosclerosis, coronary arterial injury, and the development of a subsequent plaque rupture. Such a plaque rupture was the most likely cause of the fatal arrhythmia, cardiac arrest, and respiratory failure [Douglas] experienced on [the day of his death].

Dr. Fintel concluded that "a cardiac etiology was the most likely cause of [Douglas's] persistent chest discomfort, and was a direct consequence of the motor vehicle accident [in December 2008]."

In November 2012, the deputy commissioner entered his decision denying Sharon's claim. The deputy noted the opinions of Drs. Vessey and Fintel and stated that the "opinions of both doctors are possible scenarios, and perhaps equally persuasive (reading Dr. Fintel's opinions in the best light). However, the claimant has the burden of proving causation by a preponderance of the evidence." After setting forth the boilerplate legal standards for workers'-compensation-case claims, the deputy simply stated: "Based on the finding that the claimant did not meet his burden of establishing that the death . . . was the

sequel or result of a work injury, the claimant (widow) has not established entitlement to benefits following claimant's death. As such all other issues are moot." The deputy did not discuss Dr. Watt's opinion at all.

Sharon appealed the deputy's decision, and the Iowa Workers' Compensation Commissioner affirmed the decision as the final agency decision but added additional analysis. The commissioner agreed the deputy's failure to discuss critical evidence within his decision was "troubling," but it ultimately agreed with the result. The commissioner found Dr. Watt's assessment that Douglas's death was likely the result of pulmonary emboli was of minimal support because Dr. Watt had not treated Douglas prior to him being airlifted to the hospital and both Drs. Vessey and Fintel disagreed with his opinion. The commissioner concluded Sharon failed to establish Douglas died of a pulmonary embolism. Additionally, the commissioner concluded that if Douglas died from a heart attack, Sharon failed to establish the attack was due to Douglas's work accident. Although Sharon pointed out that Dr. Vessey had not expressly considered the stress issue in his causation determination, the commissioner found "Dr. Vessey clearly was aware of the nature of the accident and decedent's course of recovery and still found that the heart attack was not due to the work accident." The commissioner also pointed out that Dr. Watt had stated at his deposition that the stress was a possible cause of the attack but conceded it could have been spontaneous given Douglas's prior artery disease.

Sharon then filed a petition for judicial review of the commissioner's decision pursuant to Iowa Code sections 17A.19(10)(c), (f), and (i)-(n) (2009), challenging the agency's factual findings, its legal conclusions, and its application

of facts to the law. Following a contested hearing, the district court entered its judicial-review ruling reluctantly affirming the agency decision. The district court explained:

> Given this court's limited standard of review, that is substantial evidence, this court has little leeway given this record. Dr. Vessey, although an internist and not a cardiologist, was a credible expert. He clearly concluded in his rational report that [Douglas's] death was not the result or sequel of the work injury.
>
> Common sense, however, would suggest the contrary. [Douglas] never fully recovered from the severe blunt chest trauma he sustained in the work accident. He continued to have pain and serious symptoms. He died [eighty-three] days after the initial collision. Dr. Fintel's opinion as a cardiologist that [Douglas's] death was the result or sequel of the work injury is persuasive to this court. [Douglas's] prolonged inactivity and debilitation contributed to his death whether or not the ultimate event was a heart attack or blood clot. Dr. Fintel's opinion that the stress of the severe physical ailments contributed to his death, is a logical and rational conclusion.
>
> In addition, this court would have given weight to the opinions of Dr. Watt. Dr. Watt is a cardiologist. He was the only medical expert who had personal contact with [Douglas]. He had the responsibility to make a determination on the cause of death when he signed the death certificate. At his deposition, he was given [Douglas's] medical history. Even with the knowledge of that history, he did not change his opinion. If this court were hearing this case at the agency level, this court would have agreed with Dr. Fintel, [Douglas's] expert, and Dr. Watt and found a causal connection between the work injury and the cause of death and granted benefits.
>
> This court, however, is not at liberty to substitute its own opinion for that of the Agency on a factual finding so long as there is substantial evidence to support the finding. In this case there is no incorrect application of the proper legal standard or incorrect interpretation of the law. The commissioner's application of the law to the facts was not illogical, irrational or wholly unjustifiable. The decision was supported by substantial evidence. This court is thus bound to affirm the commissioner's decision.

Sharon now appeals.

## II.  Scope and Standards of Review.

Our review is governed by Iowa Code chapter 17A.  *See Mike Brooks*, *Inc.*
*v. House*, 843 N.W.2d 885, 888 (Iowa 2014).  Under chapter 17A, the district
court acts in an appellate capacity to correct errors of law.  *Id.*  In reviewing the
district court's decision, we apply the standards of chapter 17A to determine
whether we reach the same conclusions as the district court.  *Id.* at 889.  If we
do, we affirm; if not, we reverse.  *Id.*  In reviewing agency action, the district court
may only reverse or modify if the agency's decision is erroneous under one of the
provisions set forth in Iowa Code section 17A.19(10) and a party's substantial
rights have been prejudiced.  *Gits Mfg. v. Frank*, 855 N.W.2d 195, 197 (Iowa
2014).

"Medical causation presents a question of fact that is vested in the
discretion of the workers' compensation commission."  *Cedar Rapids Cmty. Sch.*
*Dist. v. Pease*, 807 N.W.2d 839, 844-45 (Iowa 2011).  Consequently, we will
"only disturb the commissioner's finding of medical causation if it is not supported
by substantial evidence."  *Id.* at 845 (citing Iowa Code § 17A.19(10)(f)).  Iowa
Code section 17A.19(10)(f)(1) defines "substantial evidence" as "the quantity and
quality of evidence that would be deemed sufficient by a neutral, detached, and
reasonable person, to establish the fact at issue when the consequences
resulting from the establishment of that fact are understood to be serious and of
great importance."  It is not enough that different conclusions may be drawn from
the evidence.  *Mike Brooks*, 843 N.W.2d at 889.  Our job is to determine whether
substantial evidence supports the findings actually made.  *Id.*  "Legal error is
present under the substantial evidence analysis when an agency reaches a

conclusion based on uncontroverted evidence which is contrary to the conclusion reasonable minds would reach." *Riley v. Oscar Mayer Foods Corp.*, 532 N.W.2d 489, 491 (Iowa Ct. App. 1995). Thus, we review Sharon's allegations of error to determine if the factual findings of the workers' compensation commissioner regarding causation are supported by substantial evidence. S*ee id.*

### III. Discussion.

A heart attack may be a compensable 'injury,' even if the claimant already had latent heart disease, if claimant establishes, by a preponderance of the evidence, that some employment incident or activity was a proximate cause health impairment on which he bases his claim. *See Sondag v. Ferris Hardware*, 220 N.W.2d 903, 905 (Iowa 1974); *Holmes v. Bruce Motor Freight, Inc.*, 215 N.W.2d 296, 297 (Iowa 1974). While a mere possibility of causation is not sufficient, absolute certainty is not required to be shown. *See Sondag*, 220 N.W.2d at 905, 907. Rather, "probability is necessary," though the "incident or activity need not be the sole proximate cause, if the injury is directly traceable to it." *Holmes*, 215 N.W.2d at 297. However, "[w]hether an injury has a connection to the employment is essentially within the domain of expert testimony." *Dunlavey v. Econ. Fire & Cas. C*o., 526 N.W.2d 845, 853 (Iowa 1995); *Merch. v. SMB Stage Lines*, 172 N.W.2d 804, 807 (Iowa 1969). Though we note that a few states have held that "a claimant may be aided in the task by a presumption that, when death follows soon after an injury, the death was caused by the injury," *see* 1 Arthur Larson & Lex K. Larson, *Larson's Workers' Compensation Law* § 7.04[2][a], at 7-36 (2013) (and cases cited therein), such a presumption does not exist in Iowa.

Though we do not rubber stamp the agency's decision, *see Pease*, 807 N.W.2d at 845, our review is nevertheless extremely limited. "[W]hen we review factual questions delegated by the legislature to the commissioner, the question before us is not whether the evidence supports different findings than those made by the commissioner, but whether the evidence 'supports the findings actually made.'" *Larson Mfg. Co. v. Thorson*, 763 N.W.2d 842, 850 (Iowa 2009*); see also Mike Brooks*, 843 N.W.2d at 889. While we might not have found the way the commissioner found, Dr. Vessey's opinion, even as an internist and not a cardiologist like the other experts, was that Douglas's death was not caused by the accident. The commissioner relied upon Dr. Vessey's opinion that Douglas was simply "one of the 250,000-300,000 Americans who die every year of cardiovascular collapse." Consequently, the agency's decision was supported by substantial evidence, and we cannot conclude its decision to accept Dr. Vessey's opinion over the other experts was irrational, in light of our legislative directive.

### IV. Conclusion.

This is a tough case all around, given that the accident was neither Douglas's nor his employer's fault. However, we recognize the oft-repeated principle that the "appellate court should not consider evidence insubstantial merely because the court may draw different conclusions from the record." *Arndt v. City of Le Claire*, 728 N.W.2d 389, 393 (Iowa 2007). Here, we find substantial evidence supports the agency's finding that Sharon did not prove by a preponderance of the evidence that Douglas's accident was a cause of his tragic death. Consequently, we affirm the district court's judicial review ruling.

**AFFIRMED.**