# IN THE COURT OF APPEALS OF IOWA

No. 17-1774
Filed September 12, 2018

**RONALD WILLIAM BRINCK,**
    Plaintiff-Appellant,

**vs.**

**SIOUXLAND MENTAL HEALTH CENTER and THE CINCINNATI INSURANCE COMPANY,**
    Defendants-Appellees.
_____

Appeal from the Iowa District Court for Polk County, Rustin T. Davenport, Judge.

Ronald Brinck appeals the dismissal of his petition for judicial review affirming the Workers' Compensation Commissioner's denial of his petition to review-reopen a prior action. **AFFIRMED.**

Mark S. Soldat of Soldat & Parrish-Sams, PLC, West Des Moines, for appellant.

Kathleen Roe of Rawlings, Ellwanger, Mohrhauser, Nelson & Roe, LLP, Sioux City, for appellees.

Considered by Vaitheswaran, P.J., and Doyle and Mullins, JJ.

**DOYLE, Judge.**

After the Workers' Compensation Commissioner denied Dr. Ronald Brinck's petition to reopen his prior workers' compensation settlement agreement with his former employer, Brinck filed a petition for judicial review in district court challenging the denial. The district court affirmed the commissioner's determination that Brinck failed to establish his mental disorder was caused by his earlier work injury, finding substantial evidence supported the commissioner's decision. The district court also affirmed the commission's conclusion that, even if Brinck had demonstrated his psychosis was related to his earlier work injury, Brinck's claim was barred by res judicata. Brinck now appeals the district court's denial of his petition for judicial review. Upon our review, we affirm.

### I.  *Applicable Law*.

Generally speaking, after an employee is awarded workers' compensation benefits for an injury sustained at work, the case is closed, whether the award came at the end of exhausting administrative remedies or by way of a settlement agreement. *See generally Kohlhaas v. Hog Slat, Inc.*, 777 N.W.2d 387, 391-93 (Iowa 2009) (discussing workers' compensation review-reopening proceedings); *U.S. W. Commc'ns., Inc. v. Overholser*, 566 N.W.2d 873, 875 (Iowa 1997) (same). However, if the employee's condition changes after the award or settlement related to the prior injury, such as "the worsening of a physical condition or a reduction in earning capacity," the employee may seek additional or increased compensation from the employer by way of a review-reopening proceeding under Iowa Code section 86.14(2) (2011). *See Kohlhaas*, 777 N.W.2d at 391-93. At such proceeding, the employee must prove by a preponderance of the evidence that the

employee's current condition is "proximately caused by the original injury." *Id.* at 392.

One way to satisfy this proximate-cause requirement is for the employee to demonstrate his or her physical condition has worsened. *See id.* Nevertheless, this is not the only way to establish that the employee's current condition is "proximately caused by the original injury." *Id.* Importantly, the employee "need not prove, as an element of his claim, that the current extent of disability was not contemplated by the commissioner (in the arbitration award) or the parties (in their agreement for settlement)." *Id.* Thus, the employee does not have "to demonstrate his current condition was not contemplated at the time of the original settlement." *See id.* at 393. However, "section 86.14(2) does not provide an opportunity to relitigate causation issues that were determined in the initial award or settlement agreement." *Id.* "[T]he principles of res judicata still apply." *Id.* Thus, the commissioner, in a review-reopening proceeding, "should not reevaluate an employee's level of physical impairment or earning capacity if all of the facts and circumstances *were known or knowable at the time of the original action*." *Id.* (emphasis added).

## II. *Background Facts and Proceedings.*

In 2009, Dr. Ronald Brinck "sustained an injury arising out of and in the course of his employment" with Siouxland Mental Health Center ("the Center").[1] He filed a petition seeking workers' compensation for the injury, which stated: "While walking down the [Center's] hallway, his cane became stuck in the

---

[1] Siouxland Mental Health Center's insurance carrier is The Cincinnati Insurance Company. Hereinafter, we will refer to them collectively as "Siouxland."

carpet and he tripped and fell forward, thereby hitting his head at the right side of the door." The petition stated Brinck's "whole body" was affected or disabled. The expenses incurred that were listed on the petition included the psychological services of a hospital. Brinck returned to work full-time in February 2010.

In November 2012, Siouxland and Brinck subsequently entered into a settlement agreement for workers' compensation benefits that was approved by the workers' compensation commissioner. The agreement stated Brinck sustained a "permanent partial disability for 50% loss of BAW/earning capacity . . . resulting in 250 weeks of compensation under Iowa Code section 85.34(2)(U) payable commencing February 15, 2010." The agreement stated Brinck "is entitled to medical care for the injury, including care in the future," citing sections 85.26(2) and 85.27. The agreement further provided that evidence corroborating "this settlement is attached." Attached thereto were numerous hospital records, including the November 2010 report of Dr. Douglas Martin. Dr. Martin's report included his review of another medical professional's May 2009 report following that doctor's neuropsychological assessment of Brinck. Dr. Martin's report stated:

> We spent a considerable amount of time . . . reviewing the Neurological Assessment of Dr. Meyers, which is a rather interesting report, from the standpoint that Dr. Meyers was unable to specifically identify a pattern consistent with a closed head injury or postconcussion situation. He suggested that sleep apnea, seizures and depression may be interference with that; however, upon my review, it is also just as likely that seizure disorders and emotional and behavioral disturbances can also be created by traumatic brain injuries, so it is a bit difficult to interpret. It is certainly a possibility that this gentleman had a substantial issue with preexisting depression and that may also be clouding the picture here, with respect to the situation. However, I cannot dismiss Dr. Meyers' conclusions that, based upon his Neurological testing and data, the pattern and score was, indeed, unusual. There seemed to be some inconsistency in performance as to what would be expected.

However, I would also state that it might be true here that, with respect to a significantly high level I.Q. functioning individual prior to the incident, often times professional show sometimes bizarre findings on Neuropsychological profiles that are performed after incidents such as this.

After a review of the clinical data and my interview with Dr. Brinck, I felt that his situation was consistent with mild cognitive residuals from a closed head injury/traumatic brain incident.

ASSESSMENT:
(1) History of closed head injury/traumatic brain incident from May 6, 2009.
(2) Presumptive diagnosis of posttraumatic seizure disorder
(3) Depressive disorder
(4) Sleep apnea . . . .
            . . . .
CAUSATION:
            . . . .
There appears to have been some depressive issues prior to this incident, and it is somewhat difficult to characterize whether these depressive symptoms have been worsened by this episode. Perhaps they were, from a short-term standpoint, but is probably unlikely that they would be permanently, from a long term standpoint.

Another report from Dr. John Kuhnlein dated October 8, 2012 was attached, wherein Dr. Kuhnlein opined:

[I]t is more likely than not that the seizure disorder is permanent. [Brinck] still has ongoing issues with posttraumatic headaches, and has significant issues with the cognitive deficits. In all likelihood, he would appear to be normal on formal testing, but that may be misleading as Dr. Brinck was so high functioning before, and so a deficit for him would still appear to be normal on formal testing.

Brinck continued working for the Center until November 4, 2013. On that date, Brinck voluntarily admitted himself to a hospital "for protection from harm to himself and others." On November 5, 2013, the attending physician stated in the "Admit Notes":

I have seen and examined [Brinck] on the unit on Tuesday, 11/5/13. Medical records and documentation reviewed. I reviewed his presentation with the treatment extensively that [morning] . . . . I had met with [Brinck] several [years] ago and recall him as a sharp,

witty, low-key fellow who was an effective communicator. He is different now. He suffered a CHI [in] April, 2009, that unfortunately changed his life. He developed a seizure disorder as a consequence of his head injury . . . . He has reportedly had at least 2 separate neuropsych [evaluations], and he wondered if he had at least 3 of them. He is not certain. He admitted that his ability to learn new info is a problem. [He] has been attempting to compensate for it by leaving the session to quickly read about a new med or to review other information so that he can return to the session with that Information for his client. He has had neuroimaging studies, EEG, and is presently seeing Dr. Sanjay Singh in Omaha at Alegent-Creighton for the Sz Disorder. He cannot tell me if Temporal Lobe Epilepsy has been ruled out. He could not tell me the name of the clinic where he sees Dr. Singh. Delusions of reference and persecution, and thought insertion have reportedly been present for almost 2 yrs. he has hidden them from others to spare them (family/ friends) from being under suspicion simply by being associated with him. The government and certain agencies are behind this, In his report. He stated to me "I have to protect them." That is why he has become more isolated. [Brinck] has experienced a bout of "depression" prior to the CHI but his mood has become worse since the injury. He remains on [medication]. He is now admitted d/t increasing intensity of intrusive, Irrational and occasionally uncharacteristic violent thoughts which force him to volley between confronting the unreality with reality. It . . . has been exhausting to do and it also has made him feel more sad, hopeless, and this has led to uncharacteristic suicidal thoughts. He is a man of strong moral character so these thoughts are quite disturbing to him. . . . Working to reduce the paranoia seems to be the way to go. . . . We will work to acquire additional medical/ neuro information.

The resident physician that examined Brinck at intake stated in the Progress Note:

Dr. Brinck notes that after the [2009] accident severe depression set in. There was a time that he was very isolative and extremely down. He feels that mood did increase for some time after seizures were controlled . . . . He has history of mild depressive symptoms in college as well. He has been feeling more down and depressed lately. He has constant thoughts of suicide that are daily. He attempted suicide shortly after accident by overdosing on unknown medication . . . . Last year he attempted to overdose on his daughter's [medication] and did not tell anyone about this including his wife. He has had times he has sat in his garage and looked around to ascertain what he could use to harm himself. He notes he has many detailed plans in his head. He has also had thoughts of hurting others. He does not elaborate who he has thoughts of hurting and states he does not wish to discuss this

currently. He does not think he would actually ever hurt anyone. He denies weapons in his home. He has had struggles controlling anger symptoms which is unlike him and cursed at his son prior to admission.

For the past two or more years the patient has been struggling with extreme paranoia. He tells the writer he believes that a chip has been implanted in his head. He is worried that he is constantly being watched and monitored. He does not use home computer for fear that others will be able to monitor him. He uses work computer strictly for patient work. He worries that beeping lights in his house·are spying on him. He feels that the TV talks to him in the middle of the night and confirms that he is being watched. He believes that his cell phone has been bugged and is being monitored. He feels that others think he is a terrorist. He has been isolating and staying in his room. He fears that if he comes out of his room that his children and wife will be monitored as well. He feels that others are putting thoughts into his head and at times wants to tell suicidal patients to hurt themselves or psychotic patients to believe the psychosis symptoms. He does not think he has done this and notes patients tend to get along well with him. . . . He has struggled with these symptoms in silent for quite some time because he worries constantly about losing his license, not being able to practice, and financial consequences to his family. He denies auditory hallucinations. He notes there was a time a year ago he experienced bizarre visual hallucinations and now occasionally sees spider webs and shadows out of the comer of his eye. He struggles with anxiety due to the symptoms but denies panic symptoms. . . .

At that time, Brinck reported a significant family history of psychological issues, including depression and schizophrenia.

Brinck subsequently sought to have his workers' compensation case reopened, asserting his 2009 head injury had caused him further temporary disability and additional permanent disability after November 2012. Siouxland affirmatively defended that Brinck's claim was barred by res judicata and that Brinck "knew of his conditions of which he now complains at the time of entering into the agreement for settlement." The matter was heard by a deputy workers' compensation commissioner in 2016, and thereafter, the deputy filed his "Review-Reopening Decision" finding Brinck failed to prove that "his psychosis was

connected to his work injury.  [Brinck's] psychosis condition has not been proven to be related to his work injury, predated the settlement in this case, and is res judicata."  The deputy found Brinck was not entitled to additional permanent disability benefits.

Brinck appealed the deputy's decision, and the workers' compensation commissioner affirmed and adopted the deputy's decision in its entirety.  Brinck requested a rehearing, which the commissioner subsequently denied in a more detailed decision.  Brinck then filed a petition for judicial review in district court challenging the agency's decision, which the district court denied.

### III.  Standard of Review.

Brinck now appeals the district court's ruling.  He raises issues of res judicata and causal connection, contending the district court erred in two respects: (1) "by affirming the commissioner's creation and application of a res judicata rule which never had been recognized by the supreme court," and (2) "by affirming the commissioner's creation and application of a review-reopening statutory construction never recognized by the supreme court."

On a petition for judicial review of a commissioner's decision, the district court acts in an appellate capacity to correct errors of law.  *See Mike Brooks, Inc. v. House*, 843 N.W.2d 885, 888-89 (Iowa 2014).  When the judicial-review ruling is appealed, the appellate court applies "the standards of chapter 17A to determine whether we reach the same conclusions as the district court.  If we reach the same conclusions, we affirm; otherwise we may reverse."  *Id.* at 889.

Factual determinations, including determinations of medical causation or whether to accept or reject an expert opinion, are vested in the discretion of the

commissioner, and we are bound by those fact-findings "if they are supported by 'substantial evidence in the record before the court when that record is viewed as a whole.'" *Id.* (quoting Iowa Code § 17A.19 (10)(f)). "Evidence is substantial if a reasonable mind would find it adequate to reach the same conclusion. An agency's decision does not lack substantial evidence because inconsistent conclusions may be drawn from the same evidence." *Evenson v. Winnebago Indus., Inc.*, 881 N.W.2d 360, 366 (Iowa 2016).

Conversely, "we are not bound by the agency's interpretation of the law and 'may substitute our interpretation for the agency.'" *Grant v. Iowa Dep't of Human Servs.*, 722 N.W.2d 169, 173 (Iowa 2006) (citation omitted). Whether res judicata is applicable is question of law. *See id.*

### IV. Discussion.

### A. Causal Connection.

Section 86.14(2) directs the commissioner to inquire "into whether or not the condition of the employee warrants an . . . increase of compensation so awarded or agreed upon." To warrant an increase of compensation, Brinck had to establish "by a preponderance of the evidence that, subsequent to the date of the award under review, he or she has suffered an impairment or lessening of earning capacity proximately caused by the original injury." *Simonson v. Snap-On Tools Corp.*, 588 N.W.2d 430, 434 (Iowa 1999) (emphasis omitted). "For workers' compensation purposes a cause is proximate if it is a cause; it need not be the only cause." *Miller v. Lauridsen Foods, Inc.*, 525 N.W.2d 417, 420 (Iowa 1994). Stated another way, "[t]he incident or activity need not be the sole proximate cause, if the injury is directly traceable to it." *Holmes v. Bruce Motor Freight, Inc.*,

215 N.W.2d 296, 297 (Iowa 1974). "The necessary showing . . . may be made without proof of change in physical condition." *E.N.T. Assocs. v. Collentine*, 525 N.W.2d 827, 829 (Iowa 1994). But "a possibility is insufficient; a probability is necessary; and the commissioner's findings have the force of a jury verdict." *Sondag v. Ferris Hardware*, 220 N.W.2d 903, 905 (Iowa 1974).

Our analysis is shaped largely by the deference we are statutorily obligated to afford the agency. *See Mike Brooks, Inc.*, 843 N.W.2d at 889. Because "[m]edical causation is a question of fact vested in the commissioner's discretion," we are bound to uphold the commissioner's factual finding on appeal if the finding "is supported by substantial evidence when the record is viewed as a whole." *Id.*

"Generally, expert testimony is essential to establish causal connection," and, as the fact-finder, "[t]he commissioner must consider the expert testimony together with all other evidence introduced bearing on the causal connection between the injury and the disability." *Sherman v. Pella Corp.*, 576 N.W.2d 312, 321 (Iowa 1998). The commissioner "determines the weight to be given to any expert testimony," *id.*, and that "testimony, even if uncontroverted, may be accepted or rejected in whole or in part by the commissioner, as a finder of fact." *Weishaar v. Snap-On Tools Corp.*, 506 N.W.2d 786, 790 (Iowa Ct. App. 1993). Ultimately, in determining causation, the "commissioner is free to reject expert testimony so long as valid reasons are specified as to why this is done." *Leffler v. Wilson & Co.*, 320 N.W.2d 634, 637 (Iowa Ct. App. 1982).

Here, Brinck complains of the commissioner's reliance upon the opinion of Siouxland's expert, Dr. Bruce Gutnik, because "Dr. Gutnik did not opine that the [2009] work injury was <u>not</u> a substantial factor in bringing about Brinck's

psychosis." (Internal quotation marks and brackets omitted.) But that is not the standard we are faced with. Rather, Dr. Gutnik opined he could "not relate Dr. Brinck's psychosis to his work injury" with a reasonable degree of medical certainty. Dr. Gutnik explained:

> There are at least three other prior concussions, sleep apnea, and hypothyroidism, which all could cause his current symptoms. Further, although rare, it is possible that he has developed mild Paranoid Schizophrenia based on family genetics. Finally, people can develop psychotic symptoms with no known pre-existing cause.
> With all of these potential causes for psychotic symptoms, I cannot relate Dr. Brinck's current symptomatology to his April 14, 2009 injury.

Although there are contrary opinions, for the reasons stated by Dr. Gutnik, it is reasonable to reach the conclusion Brinck's psychosis was not related to his work injury. As the district court points out, the deputy commissioner, in his adopted decision, "did not blindly reject the views of the other medical providers" in relying upon Dr. Gutnik's opinion. Rather:

> The deputy's decision critiqued each medical opinion and pointed to the limitations and concerns that accompanied the opinion. Even if, as petitioner now argues, [Brinck's expert] Dr. Gallagher had as complete information as Dr. Gutnik, the deputy commissioner clearly demonstrated Dr. Gallagher's report was deficient in some aspects when compared to Dr. Gutnik (such as failure to consider a family history of schizophrenia). [The opinions of Brinck's other experts, Drs. Sharma and Vaca,] were discounted because they were not provided all of petitioner's records. [Brinck's last expert, Dr. Roge,] was close personal friends with petitioner, was not aware petitioner had suffered previous head trauma, and had no experience in psychiatry. The deputy commissioner clearly outlined the reasoning for the finding that Dr. Gutnik's opinion was more persuasive than the other medical providers.

There is no question a conclusion inconsistent with this opinion could be drawn from the same evidence, but that does not mean there was insubstantial evidence to support the agency's fact-finding. *See Evenson*, 881 N.W.2d at 366. Viewing

the record as a whole, Dr. Gutnik's reasonable opinion supports the agency's determination that Brinck failed to establish his psychosis was proximately caused by his 2009 injury. We are therefore bound by the finding and affirm the issue.

### B. Res Judicata.

Turning to the other claim, the district court also found the agency did not err in determining that had Brinck established proximate cause, his claim was barred from relitigation by res judicata. The doctrine of res judicata prevents a party from relitigating a claim or issue that has already been determined by a final judgment. *See George v. D.W. Zinser Co.*, 762 N.W.2d 865, 868 (Iowa 2009). Though agency determinations are entitled to some preclusive effect in a judicial proceeding, *see id.*, "[t]he question of the degree to which the actions of administrative agencies should be entitled to preclusive effect has been a subject of some difficulty." *Ghost Player, LLC v. Iowa Dep't of Econ. Dev.*, 906 N.W.2d 454, 462 (Iowa 2018). Generally, "[a]n agency determination will be entitled to preclusive effect in a judicial proceeding 'when an administrative agency is acting in a judicial capacity and resolved disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate.'" *George*, 762 N.W.2d at 868 (cleaned up);[2] *see also Pinkerton v. Jeld-Wen, Inc.*, 588 N.W.2d 679, 680 (Iowa 1998).

Brinck asserts, *in arguendo*, that Brinck's statements in November 2013 upon his self-admission to the hospital about knowing he had a deeper,

---

[2] "Cleaned up" is a relatively new parenthetical used to indicate that internal quotation marks, alterations, and citations have been omitted from quotations for readability purposes. *See United States v. Steward*, 880 F.3d 983, 986 n.3 (8th Cir. 2018); Jack Metzler, *Cleaning Up Quotations*, 18 J. App. Prac. & Process 143 (Fall 2017).

psychological issue he hid from others would not establish Brinck had suffered a permanent disability when the earlier matter was settled. We disagree. As the district court reasoned:

> [T]he finding that [Brinck] knew he was suffering from psychosis prior to entry of the settlement agreement is supported by substantial evidence. The settlement agreement was approved on November 27, 2012. [Brinck] was admitted to [the hospital] on November 4, 2013. . . . Hospital records state [Brinck] reported he had been experiencing delusions of reference and persecution and thought insertion for two years. [Brinck] indicated he had hidden the symptoms from others. After his release from the hospital, [Brinck] informed the nurse case manager . . . he had recent psychiatric issues but did not think his issues were related to his work injury. [Brinck] also testified that he told the truth to his medical providers, and he could not recall when his psychosis symptoms started.

At the reopening proceeding, Brinck testified that although he did not recall the incident, his wife told him he attempted suicide shortly after the 2009 injury. There is no indication that we can find in the record that Brinck or his wife told medical professionals about the suicide attempt. In fact, Brinck told his neuropsychologist he had no symptoms of suicide ideation in July 2012, and there is no indication Brinck told him of the earlier suicide attempt. That the suicide attempt shortly followed his accident certainly evidences, had the mental condition been related to his injury, Brinck could have litigated it as part of the settlement agreement. Brinck may have been admitted to the hospital in November 2013, but it was not the first indication there were more psychological issues to be uncovered, regardless of whether those issues were caused by his unfortunate injury.

Brinck is in the unique position of both having a severe psychological disorder and being a bright psychological-medical professional. We are not

unsympathetic to his issues, particularly when his failure to disclose his symptoms may be caused by his disorder. But by Brinck's own testimony, his wife knew he had attempted suicide shortly after his injury without, as far as we can tell from the record, bringing it to his doctors' attention. Brinck returned to work in 2010 and settled his workers' compensation claim in 2012; clearly he had the opportunity to litigate his psychosis as part of the settlement agreement. He did not. His claim is barred by res judicata.

### V. Conclusion.

Substantial evidence by way of an expert's reasonable opinion supports the agency's determination that Brinck failed to establish his psychosis was proximately caused by his 2009 injury. Moreover, the district court did not err in affirming the agency's conclusion that, even if Brinck could establish causation, his claim is barred by res judicata because he could have litigated the issue at the time of his settlement but did not. Accordingly, we affirm the district court's ruling denying Brinck's petition for judicial review.

**AFFIRMED.**